McClary v. Stull.

MIRANDA J. McCLARY ET AL. v. JOHN S. STULL ET AL.

FILED MARCH 5, 1895. No. 6512.

1. Wills: PROBATE: VALID AND INVALID BEQUESTS: INCAPACITY OF BENEFICIARY. It is no objection to the probate of a will containing one or more valid bequests that a particular bequest or devise is invalid on the ground that the beneficiary thereof is incapable of taking or holding the property sought to be thereby disposed of.

2. ———: ———: ———. The will in such case should be proved for the purpose of giving effect to the valid provisions thereof.

3. Trial: VERDICT: FAILURE OF JURY TO MAKE SPECIAL FINDINGS: HARMLESS ERROR. It is not reversible error to receive a general verdict or finding, leaving unanswered special interrogatories submitted to the jury, when, if answered in the form most favorable to the complaining party, they would not be inconsistent with the general verdict.

4. Wills: MENTAL CAPACITY OF TESTATOR: SPIRITUALISM. Mere eccentricity of belief, including a belief in spiritualism so-called, is not conclusive evidence of a want of testamentary capacity,

McClary v. Stull.

provided the testator is not affected with any delusion respecting matters of fact connected with the making of the will or the objects of his bounty.

5. ———: ———: PROBATE. Where the testator's mind is not so controlled by his peculiar views as to prevent the exercise of a rational judgment touching the disposition of his property the will should be sustained, however absurd or irrational such views may be.

6. ———: ———. Where the testator is not claimed to have been generally insane, but controlled by insane notions with respect to a particular subject, the question to be determined is whether he was the victim of such delusions as controlled his actions and rendered him insensible to the ties of blood and kindred.

7. Trial: RECALLING OF JURY: INSTRUCTIONS: REVIEW. The recalling of juries for instructions is so far within the discretion of the trial court as not of itself to present a subject for review.

8. Instructions: HARMLESS ERROR. The charge of the court should be confined to questions in issue, although a judgment will not be reversed on account of an instruction directed to a matter foreign to the issues which merely imposes upon the successful party an additional and unnecessary burden, and in no wise prejudicial to the party complaining.

9. Attorneys' Fees: ALLOWANCE: FUNDS UNDER CONTROL OF COURT. Courts of equity, in dealing with funds brought directly within their control, frequently order payment therefrom of fees to counsel of the respective parties; but that practice rests upon the theory that the proceeding is primarily for the purpose of securing the direction of the court with respect to such fund, and therefore alike beneficial to all parties.

10. ———: ———. Fees to counsel are not in such cases allowed as a matter of right, but are within the discretion of the court and will be denied unless there appears to be reasonable ground for the controversy by the party applying therefor.

11. Wills: CONTESTS: ATTORNEYS' FEES: ALLOWANCE. On an application for attorneys' fees by the contestants who had unsuccessfully resisted the probate of a will, one of them made affidavit to an agreement in writing with their attorneys, whereby the latter were to prosecute the contest for twenty per cent of the amount realized out of the estate. In answer, they denied the existence of a written contract without disclosing their agreement with contestants. *Held*, That the application should be denied.

12. ——: EVIDENCE OF VALIDITY. Evidence examined, and *held* to sustain the verdict establishing the will of the testatrix.

ERROR from the district court of Nemaha county. Tried below before BUSH, J.

The facts are stated in the opinion.

*W. C. Sloan* and *A. J. Burnham,* for plaintiffs in error:

The pretended will seeks to raise a trust to a charitable use, and in order that there be a good devise or bequest there must be a clearly defined beneficiary who can take under the will; and unless there is such beneficiary the bequest is void, and such beneficiary must be one who can enforce the trust in a court of equity. (*Tilden v. Green,* 130 N. Y., 29; *Levy v. Levy,* 33 N. Y., 97; *Prichard v. Thompson,* 95 N. Y., 76; *Read v. Williams,* 125 N. Y., 560; *Lepage v. McNamara,* 5 Ia., 125; *Fosdick v. Town of Hempstead,* 125 N. Y., 581; *Owens v. Missionary Society,* 14 N. Y., 380; *Dashiell v. Attorney General,* 9 Am. Dec. [Md.], 572; *Bridges v. Pleasants,* 44 Am. Dec. [N. Car.], 100; *Holland v. Alcock,* 108 N. Y., 312; *Heiss v. Murphey,* 40 Wis., 276; *Estate of Hoffen,* 70 Wis., 522; *Gallego v. Attorney General,* 3 Leigh [Va.], 487; *Walderman v. City of Baltimore,* 8 Md., 551; *White v. Fisk,* 22 Conn., 31.)

The will is void for uncertainty as to beneficiaries, and as to its objects and purposes. It substitutes the will of the trustees for that of the testatrix. The court cannot enforce the trust sought to be created by the will. (*Dashiell v. Attorney General,* 9 Am. Dec. [Md.], 572; *Wheeler v. Smith,* 9 How. [U. S.], 55; *Beall v. Drane,* 25 Ga., 430; *Trippe v. Frazier,* 4 Har. & J. [Md.], 344; *Goddard v. Pomeroy,* 36 Barb. [N. Y.], 546; *Grimes v. Harmon,* 35 Ind., 198; *Fontain v. Ravenel,* 17 How. [U. S.], 369; *Beekman v. Bonsor,* 23 N. Y., 298; *Yingling v. Miller,* 26 Atl. Rep. [Md.], 491; *Andrew v. New York Bible Society,* 4 Sandf. [N. Y.], 156; *Rhodes v. Rhodes,* 13 S. W. Rep.

[Tenn.], 590; *Montgomery v. Montgomery*, 11 S. W. Rep. [Ky.], 596; *Sutherland v. Sydnor*, 6 S. E. Rep. [Va.], 480; *Couch v. Eastham*, 3 S. E. Rep. [W. Va.], 23; *Stokes v. Van Wyck*, 3 S. E. Rep. [Va.], 387; *New Orleans v. Hardie*, 9 So. Rep. [La.], 12; *Bristol v. Bristol*, 53 Conn., 242.)

The Society of the Home for the Friendless has no legal capacity to take under the will either absolutely or as trustee. (*State v. Atchison & N. R. Co.*, 24 Neb., 144.)

It was error to recall the jury without a request from them and give an instruction at the request of proponents. (*Yates v. Kinney*, 23 Neb., 648.)

It was error to receive the general verdict and discharge the jury without special findings. (*Doom v. Walker*, 15 Neb., 339.)

Contestants' attorneys are entitled to an allowance for fees out of the proceeds of the estate. (*Seebrock v. Fedawa*, 33 Neb., 413.)

The following authorities were also referred to by counsel for plaintiffs in error in their argument on the question of the capacity of the testratrix to make a will: *Klosterman v. Alcott*, 27 Neb., 685; *Galloway v. Hicks*, 26 Neb., 531; *City of Crete v. Childs*, 11 Neb., 252; *Meyer v. Midland P. R. Co.*, 2 Neb., 319.

*J. H. Broady, contra:*

The proponents should, in the first instance, make out a *prima facie* case which follows from the proof of execution. Then the burden of proof of insanity is on contestants. Afterward original testimony of sanity may be offered by the proponents. (*Seebrock v. Fedawa*, 30 Neb., 424; *Chrisman v. Chrisman*, 18 Pac. Rep. [Ore.], 6.)

Capacity to make a contract is sufficient capacity to make a will. It is not necessary that the testator be mentally or bodily sound, or that he have no delusions. (*Spratt v. Spratt*, 43 N. W. Rep. [Mich.], 627; *Hoban v. Piquette*,

17 N. W. Rep. [Mich.], 797; *Rice v. Rice*, 15 N. W. Rep. [Mich.], 545; *Dullam v. Wilson*, 19 N. W. Rep. [Mich.], 122; *Otto v. Doty*, 15 N. W. Rep. [Ia.], 578; *Meeker v. Meeker*, 75 Ill., 266; *Rutherford v. Morris*, 77 Ill., 410; *Smith v. Jones*, 34 N. W. Rep. [Ia.], 309.)

Spiritualism is neither insanity nor an insane delusion. An insane delusion does not break a will unless it be proven that the will is the product of the delusion. (*Fifield v. Gaston*, 12 Ia., 218; *In re Smith's Will*, 8 N. W. Rep. [Wis.], 616; *Fraser v. Jennison*, 3 N. W. Rep. [Mich.], 882; *Latham v. Schaal*, 25 Neb., 540.)

Contestants are not entitled to an allowance for attorneys' fees. (*Titlow's Estate*, 29 Atl. Rep. [Pa.], 758; *West v. Place*, 23 N. Y. Sup., 1090.)

The following cases were also cited by counsel for defendants in error: *Walton v. Ambler*, 29 Neb., 643; *Graham v. Birch*, 49 N. W. Rep. [Minn.], 697; *Chadwick v. Chadwick*, 13 Pac. Rep. [Mont.], 385; *American Tract Society v. Atwater*, 30 O. St., 87; *Raley v. County of Umatilla*, 13 Pac. Rep. [Ore.], 892; *Webster v. Morris*, 28 N. W. Rep. [Wis.], 353; *In re Gibson's Estate*, 17 Pac. Rep. [Cal.], 438; *Dodge v. Williams*, 50 N. W. Rep. [Wis.], 1103; Jarman, Wills, 377; Beach, Wills, sec. 137.

POST, J.

This was a proceeding for the proof of the will of Elizabeth C. Handley, deceased, and originated in the county court of Nemaha county. The defendants in error, John S. Stull and Frank E. Johnson, who for convenience will be referred to as the proponents, are named as executors of the will, and the plaintiffs in error, who will be referred to as contestants, are the heirs at law of the deceased. The proceedings in the county court are not involved in the present controversy and will not, therefore, be noticed further in this opinion. The trial in the district court, as will be inferred from what has been said, resulted in a verdict.

and judgment establishing the alleged will, and which the contestants have removed into this court for review upon allegations of error. For a more perfect understanding of the issues involved it is deemed proper to set out the will at length, which is as follows:

"In the name of the benevolent Father of All, I, Elizabeth C. Handley, being of sound mind and memory and in fair health, realizing the uncertainty of this life, do hereby make and publish my last will and testament.

"Item First. It is my will and desire that after my death I be buried by the side of my late husband in Walnut Grove cemetery, at the village of Brownville, in Nemaha county, state of Nebraska; and that my executors hereinafter named complete the record upon the monument now erected on the burial-lot and to place at my grave suitable head and foot slabs.

"Item Second. I give, grant, and bequeath unto my beloved nephew, John C. Ward, all of my books of every description, my gold watch and chain, and all of my other jewelry of every description, and such of my family pictures as he may desire.

"Item Third. I do hereby give, grant, and bequeath unto the Home for the Friendless, now located at the city of Lincoln, in the state of Nebraska, my piano and all of my china and table ware of every description, to be owned and kept and used by said Home forever.

"Item Fourth. I hereby give, grant, and bequeath unto the said Home for the Friendless all of my household and kitchen furniture of every description; and it is my wish that the officers of said Home shall have the privilege of using said furniture or any part thereof in said Home, or to dispose of the same or any part thereof and to convert the same into money, and to use said money in such manner as they may see fit for the benefit of the inmates of said house.

"Item Fifth. It is my desire and command that my executors hereinafter named shall collect all of my property, both personal and real, bonds, stocks, credits, goods, chattels, choses in action and everything of value, except such as are herein bequeathed as above set forth, and to sell the same either at public or private sale, as may seem to them to be most advantageous; and to convert the same into money as soon after my death as the same can be done without sacrifice, and out of the proceeds of said sale to first pay all of my just debts, funeral expenses and expense of my last sickness, and the expenses of administration, and all the moneys remaining after carrying out the provisions of this will, as above set forth, I hereby give, grant, and bequeath unto the said Home for the Friendless, now located it the city of Lincoln, Nebraska.

"In this my last will and testament I well remember all of my relations, both near and remote, and as I am under no particular obligations to them or either of them, and desiring that my estate may be used for the very unfortunate class of persons who have a right to be admitted into said Home for the Friendless, I feel it to be my sacred duty to give all that I have left in this world to said Home for the benefit of the poor unfortunate people who are cared for by this Home, the grandest institution in the state of Nebraska.

"Item Sixth.   I do hereby nominate and appoint Frank E. Johnson, of Lincoln, Nebraska; Harry D. Clark, of Hot Springs, South Dakota, and John S. Stull, of Auburn, Nebraska, or the survivors of them in case of the death of either of them, executors of this my last will and testament, hereby authorizing and empowering them to adjust, release, and discharge in such manner as they may deem proper, the claims, debts, and demands due me.   I hereby authorize, direct and empower them to sell at public or private sale, as may seem to them to be the most advantageous, all my real and personal estate, and to execute and acknowledge, and to deliver to the purchaser of the same proper deeds in

fee-simple. I also further authorize and direct my said executors to reduce and convert into money all of my estate except such as is mentioned in items second, third, and fourth, and to first pay the debts and demands mentioned in items first and fifth, and then to pay the entire balance left to the said Home for the Friendless.

"I do hereby revoke all former wills by me at any time made. In testimony whereof, I have hereunto set my hand and seal this 26th day of January, in the year of our Lord one thousand eight hundred and ninety-two.

"ELIZABETH C. HANDLEY.

"Signed and acknowledged by said Elizabeth C. Handley as her last will and testament in our presence and in the presence of each other, and signed by us in her presence and at her request; and we do hereby certify that at this time the said Elizabeth C. Handley is of sound and disposing memory.

"Done at Auburn, Nebraska, this twenty-sixth day of January, A. D. 1892.

"JARVIS S. CHURCH, Auburn, Neb.
"J. L. CARSON, JR., Auburn, Neb.
"R. C. BOYD, Auburn, Neb."

The contestants, who, with the exception of John C. Ward, are the brothers and sisters of the deceased, joined in resisting the probate of the will on the following among other grounds:

1. That the deceased was not of sound and disposing mind at the time in question, and that said alleged will is the result of an insane delusion on her part by reason of which she was altogether incapable of disposing of her property, and is therefore utterly void.

2. Said will is void for the reason that the beneficiaries thereunder are uncertain and cannot be ascertained.

3. The Home for the Friendless named in said will is without legal capacity to take or hold the property thereby sought to be disposed of.

John C. Ward, who is the sole surviving heir of Comfort Ward, *nee* Scott, a deceased sister of the testatrix, and who is the legatee named in the second item or paragraph of the will, separately objected to the allowance of items Nos. 3, 4, 5, and 6 thereof on the ground that the beneficiaries are uncertain, and because the Home for the Friendless has no capacity to take or hold thereunder.

The several contestants who join in the prosecution of this proceeding in error devote many pages of their printed brief to an exhaustive review of the authorities bearing upon the validity of the provision in favor of the Home for the Friendless, and which would without doubt prove instructive in a proceeding having for its object the construction of that provision of the will; but a closer inspection of the pleadings has satisfied us that that question is not thereby put in issue. It appears from a reference to the allegations of the several contestants that no specific objection is made therein to the bequest in favor of John C. Ward. And assuming the deceased to have been possessed of the requisite mental capacity to thus dispose of her property, it follows that the will should be admitted to probate for the purpose of giving effect to that bequest without reference to the other provisions thereof. (*Greenwood v. Murray*, 26 Minn., 259; *Graham v. Burch*, 47 Minn., 171; *Farmer v. Sprague*, 57 Wis., 324; *Jones v. Roberts*, 54 N. W. Rep. [Wis.], 917; *Burkett v. Whittemore*, 15 S. E. Rep. [S. Car.], 616; *In re Will of Merriam*, 136 N. Y., 58; *Ware v. Wisner*, 50 Fed. Rep., 310; *Sumner v. Crane*, 155 Mass., 483.)

Passing to the question of the mental capacity of the deceased, we observe that the first assignment relating to that branch of the case is the giving of instructions Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 at the request of proponents. Some, indeed most, of the propositions in the instructions complained of are admitted to be accurate statements of the law. It has been settled by repeated decisions

of this court that an assignment of the giving or refusing of a group of instructions *en masse* will be considered only so far as to determine whether one or more of them correctly state the law applicable to the cause. But while we are unable to separately examine the several instructions mentioned, the contestants are in no degree prejudiced on that account, since, fortunately for them, the questions there presented are all included within the capacity of the deceased to dispose of her property by will,—a proposition which will be hereafter considered under another assignment.

The next contention which we will notice is that the district court erred in not requiring the jury to answer certain interrogatories in connection with their general verdict, to-wit:

"1. Was the mind of Elizabeth Handley at about the time of the making of the will in question affected with a delusion that she could hold direct communication with the spirit of her deceased husband, and of other deceased persons?

"2. Did such delusion influence or control the mind, actions, and conduct of Mrs. Handley in her business transactions?

"3. Was the mind of Mrs. Handley affected by a delusion at the time she executed the will in question, and was she influenced in making her will by such delusion?

"4. Was Elizabeth C. Handley of sound mind and memory when she executed said will?"

Of the foregoing questions it may be said that all except the fourth, which is in terms answered by the general finding, suggest merely evidential facts, and are not, therefore, within the contemplation of section 292 of the Code, by which it is provided that special verdicts "must present the facts as established by the evidence, and not the evidence to prove them; and they must be so presented that nothing remains for the court but to draw from them conclusions

of law." Mere delusions such as are contemplated by the interrogatories are not, as we shall presently see, conclusive evidence of a want of testamentary capacity. Had said interrogatories been answered in the manner most favorable to contestants, they would not have been entitled to judgment thereon, since such findings would still have been consistent with the general verdict. It follows that the district court did not err in receiving the verdict without requiring the jury to answer the interrogatories submitted to them. (*First Nat. Bank of North Bend v. Miltonberger*, 33 Neb., 847.) The deceased was then sixty years of age and had been a widow about ten years. The estate of her husband, to which she succeeded on his death, was valued at $36,000 or $37,000. She was evidently a woman of average intellectual endowments, and invariably managed or directed her own business affairs. Although she did not, as the result of her management, succeed in accumulating much, if any, during her widowhood, she left unimpaired the fortune inherited from her husband after contributing liberally, for one of her means, to works of charity and to religion and assisting materially her less fortunate relatives. She was a devout church-woman and deeply interested in the cause of temperance. In the summer of 1888 she attended as a delegate the national convention of the prohibition party which met in the city of Indianapolis. She was for several years a member and vice-president of the Society of the Home for the Friendless, and sought earnestly to advance its cause and usefulness. She was also recognized in the city of Brownville, where she resided for nearly if not quite forty years, as a woman of more than the average strength of character and shrewdness, and, barring the single exception, which will now be noticed, gave evidence of no mental infirmity tending in any degree to impair her testamentary capacity. There is in the record evidence which tends to prove that she was a believer in the doctrine of spiritualism and seems to have

been under the impression that she could directly and through the instrumentality of the planchette communicate with the spirits of the dead, including her deceased husband. The only evidence tending directly to establish any relation between such delusions and the execution of the will is that of Mrs. Smith, from which we quote the following:

Q. How did she act or claim to act in connection with spiritualism, or what did she do about it?

A. I think I know she was under the control in a great many of her actions and in all of her trips and business by what Planchette said.    *    *    *

Q. She told you this?

A. Yes, sir; she told me herself.

Q. State as near as you can what she did say.

A. The last time I saw her I went to bid her good-bye. She seemed very much excited in health and looked poorly. She said she had been consulting Planchette, and it had advised her about her affairs, and she wanted to go and see Judge Stull and have him transact some business for her.

Q. When was this conversation?

A. During the last part of January, 1892.    *    *    *

Q. Now, state as well as you can just what she said she would have to do about the latter part of January, 1892, at the time you spoke of.

A. She said she was going to see Judge Stull in regard to some business that Planchette had advised her to.    *    *

The will, it should be. remarked in this connection, was prepared by Judge John S. Stull, and bears date, as we have seen, of January 26, 1892, from which it is argued that her action was the direct result of the delusions above mentioned, and which so controlled her judgment as to render her insensible to the ties of consanguinity. That contention renders necessary an examination of the evidence which bears directly upon the execution of the will. Judge Stull, who had known the deceased intimately for twenty-one years, testified that she requested him to prepare her

will early in January, 1892, but being engaged at the time he made a note of her directions from which he subsequently drew the will and forwarded it to her by mail. She visited him twice or more between that date and the day of its execution, when, after some trifling changes which were made at her direction, it was taken by her to the Carson National Bank, where she had long kept an account, in order that it might be witnessed by some of the officers thereof, most of whom were acquaintances and personal friends. She was, in the opinion of the subscribing witnesses, perfectly sane, and capable of transacting her business. Of said witnesses Judge Church had known the deceased twenty-six years, Mr. Boyd seven years, and Mr. Carson, who was twenty-three years of age, had known her since his earliest recollection, and neither had ever heard her mental soundness called in question. They are corroborated also by Judge Stull's partner, Mr. Edwards, who was present when the deceased gave the directions in accordance with which the will was prepared. To Mr. Johnson, an intimate friend, who had been her neighbor in Brownville for thirty-four years, she had remarked that her property would not go to relatives, but in another direction. A few days subsequent to the making of the will, to-wit, on February 5, she visited the last-named witness at his home in Lincoln *en route* to Hot Springs, South Dakota. Learning that the witness was contemplating a trip to southern Texas in company with a number of friends, including several state officers and their families, she expressed a desire to join the party, which she did, and was absent ten or twelve days. Of the persons who accompanied her on that trip several, including Mr. Hill, state treasurer, Mr. Allen, secretary of state, and the witness Johnson testify that she was in excellent health and spirits, and from all appearances perfectly sane. It is also disclosed by the evidence that she had had other business transactions with Judge Stull and his partner about the time in question, as appears from the following testimony of the latter:

I was acquainted with her a short time only, before the making of the will. We had been doing a little business with her.

Q. How did she transact business?

A. Usually in person.

Q. When she came to the office did she come alone?

A. I do not remember that she ever came with any one. She was always alone when she came to the office to transact business. She came as an ordinary person would, and I saw nothing out of the way that would indicate insanity or anything of the kind.

Conceding all that is claimed for the testimony of the witness Mrs. Smith, it fails to establish the connection between the will and the alleged supernatural manifestations.

But the judgment must be affirmed on other and more substantial grounds. On all subjects except the one above alluded to the testatrix was mentally sound. Indeed, her general sanity is not seriously called in question. The proposition presented by the record is that with respect to the one subject she was laboring under a delusion which controlled her actions in the disposition of her property. Volumes would be required for even a summary of what has been said and written on the subject. In fact, no topic has occasioned a more animated discussion or given rise to a greater diversity of opinion than this particular phase of the problem of insanity. Eminent authority of comparatively recent date, including L.rd Brougham, have regarded the human mind as a single indivisible potency not comprising distinct functions, and consequently any impairment thereof must be absolute and not partial. (Mann, Medical Jurisprudence of Insanity, 159.) But from the various opinions there have been evolved certain accepted rules, which are especially applicable to the case at bar, viz.: (1.) Mere eccentricity of belief is not conclusive evidence of a want of testamentary capacity, provided there is no delusion respecting matters of fact connected

with the making of the will or the objects of the testator's bounty. (2.) Where the testator's mind is not so controlled by his peculiar views as to prevent the exercise of a rational judgment in the disposition of his property the will should be sustained, however absurd or irrational such views may be. (3.) Where the testator is not claimed to have been generally insane, but controlled by insane notions, the question to be determined is whether he was the victim of such delusions as controlled his action and rendered him insensible to the ties of blood and kindred? (See Cassady, Wills, 478; Beach, Wills, sec. 102; *Spratt v. Spratt*, 76 Mich., 384; *Frazer v. Jennison*, 42 Mich., 206; *Rice v. Rice*, 50 Mich., 448; *Smith v. James*, 72 Ia., 515; *Lee v. Scudder*, 31 N. J. Eq., 633; *Middleditch v. Williams*, 45 N. J. Eq., 726; *In re Tritch's Will*, 30 Atl. Rep. [Pa.], 1053; *Potter v. Jones*, 20 Ore., 239; 1 Redfield, Wills, p. 90*.)

The foregoing are selected from among the many authorities which sustain the principle above stated, and are believed to embody the law of the subject. A reference to the will itself fails to disclose any evidence of mental incapacity on the part of the testatrix or to suggest that she was controlled in any degree by her imaginary communication with the spirit of her deceased husband or others; nor can the disposition thereby made of her property be said to be unnatural or unreasonable in view of her relation to the principal beneficiary, and the further fact that she inherited said property, not through her own family, but from her husband. Again, we find in the record no evidence tending to prove that the alleged spirits, through their communications with the testatrix, tended to prejudice her mind directly or indirectly against the contestants or in favor of the Home for the Friendless. In fact, any conclusion with respect to the substance even of such communications must rest entirely upon conjecture. Law, it is said, is "of the earth, earthy" and that spirit-wills are

too celestial for cognizance by earthly tribunals,—a proposition readily conceded ; and yet the courts have not assumed to deny to spirits of the departed the privilege of holding communion with those of their friends who are still in the flesh so long as they do not interfere with vested rights or by the means of undue influence seek to prejudice the interests of persons still within our jurisdiction.    There was, it should be noted, evidence given tending to prove that Mrs. Scott, the mother of the parties hereto, was also a victim of a certain form or type of insanity; but since, as in the case of the testatrix, her sanity was never called in question until about the time of the proof of this will even among her most intimate friends and acquaintances, we think the action of the jury in rejecting all such evidence not so unwarranted as to call for a reversal on that ground.

Another assignment is the recalling of the jury after the submission of the cause and the giving of a further instruction in the following language: "The court instructs the jury that influence to violate a will must be such as to amount to force and coercion, destroying the free agency of the testator, and there must be proof that the will was obtained by this coercion, and it must be shown that the circumstances of its execution are inconsistent with any theory but undue influence, which cannot be presumed, but must be proved in connection with the will and not with other things."    The recalling of a jury for instructions is a matter so far within the discretion of the court as not to present a subject for review, assuming, of course, that the attending circumstances do not show an abuse of discretion and that the instructions given embody the law of the case.

The real criticism of the instruction in this case appears from the following quotation from the brief of contestants: "Insane delusion is not undue influence in any sense, and no question of undue influence was raised or submitted to the jury.    The instruction complained of has no application to any issue submitted to the jury, and that it was de-

cisive of the jury's verdict is shown by the fact that imme-
diately after the same was given, the jury returned into court
a verdict for the proponents." We are not prepared to assent
to the proposition that no issue of undue influence was pre-
sented by the pleadings. It is, as we have seen, alleged by
contestants that "the pretended will is the result of an in-
sane delusion existing in the mind of the testatrix," etc.,
and therefore, void. It has been held by eminent authority
that the ground of relief in such cases is not, strictly speak-
ing, the insanity of the testator but that of undue influence
in the execution of the will. (See *Thompson v. Hanks*, 14
Fed. Rep., 902; Mann, Medical Jurisprudence of Insanity,
165.) But assuming the converse of the proposition just
stated to be true, the instruction is, at most, error without
prejudice, since its effect was merely to impose upon the
prevailing party an additional and unnecessary burden.
This court has frequently condemned the practice of sub-
mitting to the jury by way of instructions questions not
presented by the issues, but we are not aware that a judg-
ment has ever been reversed on that account, where it is ap-
parent from the record that the action of the court could
not have prejudiced the rights of the complaining party.
It is, on the other hand, the settled practice of this court to
disregard harmless error at whatever stage of the proceed-
ing it is shown to have occurred.

There remains to be considered the claim of the contest-
ants for an allowance out of the estate of the deceased on
account of costs and attorney's fees. Their reliance, so far
as that contention is concerned, is upon the case of *See-
brock v. Fedawa*, 33 Neb., 413. Courts of equity have
frequently assumed, when dealing with funds brought di-
rectly within their control, to order payment therefrom of
fees to counsel for the adverse party. That practice had
its origin in the theory that such a proceeding is primarily
for the purpose of securing the direction of the court with
respect to the disposition of a particular fund, and is there-

fore alike beneficial to all parties concerned. Equitable proceedings for the construction of wills may be said to be within the rule above stated, and were evidently so regarded by this court in *Seebrook v. Fedawa*, 33 Neb., 413; but an examination of the record discloses a distinction between that case and the one before us in two essential respects. In the first place, John C. Ward, one of the contestants, in a sworn affidavit, deposes that he has communicated with counsel for the other contestants on the subject of their fees and expenses and has been assured by them that they have a written agreement whereby they are to receive twenty per cent of the amount realized by contestants out of the estate of the deceased as full compensation for their services. That statement is met by the affidavit of Mr. Burnham, who is referred to by Mr. Ward as his informant, in the following language: "This affiant never entered into a written contract with Miranda J. McClary, or any other of the contestants, regarding fees, and no such contract exists or ever did exist." Referring to Ward's affidavit, counsel for contestants dismiss the subject with the remark that the arrangement with their clients regarding compensation for their services is no concern of the proponents, since questions of like character can be raised only in controversies between attorney and client. In support of that proposition we are referred to *Omaha & R. V. R. Co. v. Brady*, 39 Neb., 48. That case would be conclusive if the proponents were seeking to interpose the alleged agreement as a defense to the merits of the cause; but the question presented is altogether different, since counsel are seeking not satisfaction for their clients, but compensation for themselves out of funds belonging to the adverse party. The evidence referred to tends to prove that they relied upon a specific agreement with them. Equity will not permit them to claim the fruits of an advantageous agreement in case of a favorable result of the litigation, and at the same time insist upon compensation out of the fund in

controversy in case of a result adverse to the claim of their clients. The question at issue is the agreement between counsel and contestants, rather than the evidence thereof, and the denial of a written agreement cannot be said to be responsive to the statements of the affidavit. Precedents, so far as our examination has extended, tend to sustain the position of the proponents on this branch of the case. In re *Titlow's Estate*, 29 Atl. Rep. [Pa.], 758, the contestant, a disinherited child, after a judgment in his favor in the trial court, compromised with those claiming adversely whereby the will was sustained. It was held that the fees of the contestant's attorneys could not be paid out of the estate, and as identical in principle see *West v. Place*, 23 N. Y. Sup., 1090; *Wilson's Will*, 103 N. Y., 374. This case is distinguishable from *Seebrock v. Fedawa* on other and more substantial grounds, viz., the attack upon the will in the district court and also in this court is particularly directed against the provision thereof in favor of the Home for the Friendless. But the validity of that bequest, as we have seen, is not involved in this proceeding. It is possible that in a subsequent proceeding for the construction of the will in order to determine the validity of that provision the interests of the beneficiaries and the heirs may be found to be so far mutual as to warrant the payment of expenses out of the estate; but upon the record presented we must decline to interfere in behalf of counsel. The judgment of the district court is accordingly

AFFIRMED.