## SAMUEL MOODY v. STATE.

No. A-2429.   Opinion Filed May 5, 1917.

(164 Pac. 676.)

1. **EVIDENCE — Accomplice Testimony — Corroboration — Connection With Crime.** Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him with its commission.

2. **SAME.** Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

3. **SAME—Sufficiency.** It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts

by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof.

4.    **HOMICIDE—Accomplice Testimony—Sufficiency of Corroboration.** Corroborating evidence in this case examined, and held sufficient to sustain a conviction.

5.    **APPEAL AND ERROR—Harmless Error—Cross-Examination.** A judgment of conviction will not be reversed because of the refusal of the court to permit further cross-examination of one of the accomplices where it is apparent that full opportunity was given for cross and recross examination, and it is not shown that any new or material matter not already covered by the previous cross-examination is to be inquired into.

6.    **APPEAL AND ERROR—Record—Argument of County Attorney.** Where the argument of the county attorney is not taken down in shorthand and embodied in the record in full and a dispute arises as to what was said in argument, this court is bound by the finding of the trial court recited in the record as to what occurred.

7.    **SAME—Harmless Error.** Where the record affirmatively discloses that the argument of the county attorney was not a comment upon the failure of the defendant to testify, but was a comment upon certain evidence introduced in the case, and was made in reply to argument along similar lines by counsel for defendant, the judgment of conviction will not be reversed. In order to constitute reversible error the argument complained of must amount to a direct or indirect comment on the failure of the defendant to testify in his own behalf.

*Appeal from District Court, Pottawatomie County;*
*Frank Mathews, Assigned Judge.*

Samuel Moody was convicted of murder, and he appeals. Affirmed.

The appellant, Samuel Moody, and the deceased, W. P. Rausin, were farmers and had lived, prior to the date of the alleged homicide on January 1, 1914, for many years on adjoining farms in Lincoln county, Okla. Rausin's farm was directly north of Moody's. Late in the evening of January 2, 1914, Rausin was found dead in a

little ravine in his wood pasture northeast of his house, and between a half and three-quarters of a mile northeast of Moody's house. His team, hitched to a wagon half loaded with wood, was found 200 or 300 yards from where the body lay. The tracks of the wagon wheels when followed back toward the body disclosed that the team had been standing for some time near the body. There were evidences of the fact that the horses had been tramping there. An examination of the body of the deceased disclosed that he had been shot in the head; his nose being shot off and his eyes shot out. The wound was apparently a shotgun wound inflicted with No. 4 shot. Very early the next morning shoe prints of human beings were found by certain witnesses near the body. Two shoe prints, one larger than the other, led to and from a little ravine and thence in the direction of the appellant's house up to his orchard near his house. At that time the appellant had some renters living on his farm in a little house a short distance from his house and between his house and the house of the deceased. On the 1st day of January, 1914, along in the afternoon of that day, persons living in the tenant house on Moody's farm saw Tommie Moody, a boy 13 years old, and son of the appellant, and Alfred or Sammie Fitzhugh, a neighbor negro boy, about 14 years old, going from the direction of the appellant's house in the direction of where the deceased was found. These parties saw that the Fitzhugh boy was carrying a shotgun at that time, but do not remember of seeing Tommie Moody carrying any weapon at all. On the evening of the 3d of January the appellant and these two boys were arrested and held in the jail at Chandler, the county seat. A few days later the Fitzhugh boy was released and turned over to his father, and on the way back home he

confessed the crime to his father and uncle and told them that the defendant had sent his son, Tommie, and him (Fitzhugh) out to murder old man Rausin, and that he had furnished him (Fitzhugh) with a shotgun shell loaded with No. 4 shot with which to commit the act. The father of Fitzhugh immediately returned and delivered Sammie to the sheriff. Later Tommie Moody confessed his connection with the crime, testifying that it was committed in the manner as detailed by Fitzhugh. They testified substantially that Alfred (Sammie) Fitzhugh came to the defendant's house on the afternoon of January 1st about 3 or 4 o'clock; that appellant and his son, Tommie, had been away from home a part of that day for the purpose of renting another farm; that the appellant invited Fitzhugh into his house, and a short time thereafter began to talk about the deceased, and demanded that Fitzhugh and his son, Tommie, go and kill the deceased. Tommie at that time was in the kitchen stacking the dinner dishes. His father brought him into the room where Fitzhugh was and told him what he wanted them to do. About that time Tommie looked out of the window and saw the deceased going from his home over into his woods pasture. He called his father's attention to that fact, and immediately his father told them to go and kill Rausin. Fitzhugh had his shotgun with him, and the appellant told Tommie to give Fitzhugh the No. 4 shell, and for him (Tommie) to go along and take his gun and help kill Rausin. In compliance with said command these boys went directly to where the deceased was loading wood, and the Fitzhugh boy shot the deceased in the forehead, and immediately thereafter Tommie Moody shot at the deceased, but the deceased was falling and Tommie's shot went over his head. Thereafter the Fitzhugh boy went directly

to his home, which was east of and within sight of the place where the homicide was committed. Tommie Moody went back home and immediately told his father what had happened. Tommie testifies that after dark that evening his father said, "Well, I am going over to see whether Rausin is dead, and if he isn't dead I'll finish him," and that his father took the shotgun and left the house, and that when he returned he, Tommie, was asleep; also that when he, Tommie, got home he said to his father, "I have done an awful dirty trick"; that his father replied, "Well, go on and finish up your chores and say nothing about it." Tommie also testified that just before he and Fitzhugh separated after the killing he told Fitzhugh not to say anything about it, or about the fact that his father had told them to kill Rausin. Tommie also testified that on one or two occasions previous to the killing his father had attempted to get him to kill Rausin, but that his nerve failed him.

Harve Rausin, a cousin of the deceased, testified that a short time before the homicide, on a foggy morning, he was out by a haystack near the line of Moody's and Rausin's farms, and that Moody was out there with a shotgun. Harve Rausin, in addition, testified that after the first trial he had a conversation at the jail in Chandler with appellant about seeing him at the haystack with the shotgun, and the appellant said in substance, "Yes, Harve; I was there; I wouldn't have harmed a hair of your head; it was Old Bill that I was after."

There is evidence tending to show that there had been ill feeling between the appellant and the deceased for a great number of years; that the appellant had made expressions of ill will at various times, and had said on one or more occasions to certain witnesses that he ought to

kill the deceased, and that he intended to shoot him into bug dust, etc.; that about a month before the homicide certain mules belonging to the appellant got into the deceased's corn patch, and that the deceased impounded them and charged the appellant $1.50 as damages; that this action on the part of the deceased enraged the appellant very much, and on the second day after the killing appellant said to his tenant, Kelly: "That $1.50 Rausin charged me for those mules was the cause of his death." There is also evidence in the record tending to show that on several occasions after the killing the appellant made contradictory statements regarding the homicide; also evidence to show that a short time prior to the homicide the appellant and his son, Tommie, purchased some shotgun shells loaded with No. 4 shot. The testimony discloses that after these tracks were found leading from the body of the deceased the sheriff and some parties with him took the shoes of Moody and placed them in these tracks, and that his shoes fitted the larger tracks exactly.

The defendant was first tried in Lincoln county, and a verdict of guilty was returned imposing the death penalty. A new trial was granted and the venue changed to Pottawatomie county. Upon the second trial a verdict of guilty was returned and punishment fixed at imprisonment for life. The appellant did not become a witness in his own behalf. He asks the reversal of this judgment because of numerous alleged errors, which will be discussed in the body of the opinion.

F. A. Rittenhouse and E. A. Foster, for plaintiff in error.

S. P. Freeling, Atty. Gen., R. McMillan, Asst. Atty. Gen., and Streeter Speakman, Co. Atty., for the State.

MATSON, J. (after stating the facts as above). It is alleged that the court erred in admitting testimony of Tommie Moody and Alfred (Sammie) Fitzhugh covering all their acts and statements at the time of the killing of J. W. Rausin before any other evidence was introduced on the part of the state to establish the fact that a conspiracy existed between these witnesses and the appellant to kill the said Rausin. The witnesses Tommie Moody and Fitzhugh were accomplices. Under our statutes they were competent witnesses; the fact that they were accomplices going only to their credibility and requiring proof independent of their testimony and corroborative thereof which tended to connect the appellant with the commission of the offense. There is no rule of law or decision in this state to the effect that an accomplice may not testify to the conspiracy or the facts forming a part of the *res gestae*. Our statutes simply provide that before a conviction can be had upon the testimony of an accomplice there must be corroboration as above indicated, and it is not necessary that such corroboration should be first introduced. The testimony, therefore, of Tommie Moody and Fitzhugh does not come within the scope of those decisions which hold that the declarations of a conspirator made to third persons in the absence of his coconspirator are not competent against the coconspirator until some independent evidence of the conspiracy is shown. The evidence of these witnesses is controlled by the statutes relating to accomplices, and the cases cited by counsel for plaintiff in error are not in point to support this contention.

But it is also contended that there was not sufficient corroboration to justify a conviction. With this contention we are unable to agree. Independent of the direct

testimony of Tommie Moody and Fitzhugh connecting the defendant with the commission of this crime, the record discloses a number of circumstances which, when considered together, in our opinion, tend also to connect the defendant with it.    Standing alone, these independent facts and circumstances would not be sufficient to authorize a verdict of guilty, but under our statutes the corroboration of an accomplice does not have to be sufficient to establish the guilt of the defendant beyond a reasonable doubt.    It is sufficient if it tends to connect the defendant with the commission of the offense.    These independent facts and circumstances must go farther than the mere proof of the commission of the offense or proof of the circumstances surrounding its commission.

Counsel for the state have divided the corroborating testimony into four classes, viz.: First, footprints; second, admissions against interest; third, false and contradictory statements; fourth, expressions of ill will, threats, and hostile acts toward the deceased—and have discussed these various subdivisions in the order above indicated.

The subdivisions above given appear to correctly cover the classes of corroborative evidence adduced upon the trial.

First, as to the footprints:

Tommie Moody testified that after Sammie Fitzhugh and himself had shot the deceased he went immediately home, quoting from his testimony as follows:

"* * * And I went on and done up the chores. and that night about 7 o'clock my father put on his coat and got his gun and says, 'Tommy, I am going to see if Rausin is dead,' and he says, 'If he ain't dead I will finish him,' and he went on out, and I was asleep when he came back."

In corroboration of this statement of Tommie Moody that his father did go from his house the night after the homicide to the body of the deceased the state introduced the witnesses Henry Griswold, G. R. Ellis, and O. C. Burgess. The substance of the testimony of these witnesses is that the next morning after the body was found, very early in the morning, they went to where the body of the deceased had been found and found the footprints of human beings near that place leading to a little ravine, and following the ravine in the direction of the appellant's house and up to the appellant's premises, and near to his house; that these tracks were then marked so as to be identified; that the next day the witness Burgess, together with others who were present, including the witness Kelly, took the shoes worn by the defendant and placed them in these tracks which had theretofore been marked, and that the shoes of the appellant fitted exactly into the larger tracks; that after the first trial of the appellant, while he was still in jail awaiting a second trial, the appellant said to Burgess that his testimony regarding the tracks was correct, but that these tracks were not his tracks, that they were the tracks of Will Kelly, and that Will Kelly had made them there that night; that he had seen Will Kelly go straight in that direction, and that he afterwards came back from there. But the evidence shows that Will Kelly had placed his shoes in the tracks, and that the tracks found were too large for Kelly's shoes, and also Kelly testified that he had not been in that direction the afternoon or the evening of the homicide. Now, it is clear that the uncontradicted testimony of Tommie Moody that his father told him to go over there and murder Rausin, together with his statement that after he came back and told his father

that he had murdered him, and his further statement that his father told him that he was going over to the scene of the homicide to see whether Rausin was still alive, and, if not, he would finish him, taken in connection with the fact that tracks were discovered leading up to and away from the scene of the homicide, which tracks fitted exactly the shoes of the appellant, corroborate Tommie Moody in his statement that his father went over there to see if Rausin was dead, and, if not, to finish him. It also corroborates his statement that his father had knowledge of the commission of the crime, or else he would not have gone to the scene of it, and, standing as it does without further explanation, tends to connect appellant with its commission. This circumstance indicates clearly that appellant visited the scene of the homicide either at the time it was committed or subsequent thereto.

If after the crime was committed and after his son had confessed to its commission, if appellant be innocent, this visit must have been for the purpose of ascertaining whether or not his son was telling the truth, and, if not connected with the commission of the crime in any way, it is unnecessary for this court to indicate what an innocent man would have done under such circumstances. And it is well established that the evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only. *State v. Jones,* 115 Iowa, 113, 88 N. W. 196; *Jefferson v. State,* 110 Ala. 89, 20 South. 434; *People v. Mayhew,* 150 N. Y. 346, 44 N. E. 971. Indeed, if direct evidence alone were required, it would be practically impossible in 90 per cent. of the cases to corroborate an accomplice, and many persons

who aid and abet in crimes secretly committed would escape punishment. In cases where circumstantial evidence is relied upon for a conviction the similarity of footprints found at or near the scene of the homicide to those of the accused or their correspondence to his shoes has been permitted to be shown. *Hodge v. State,* 97 Ala. 37, 12 South. 164, 38 Am. St. Rep. 145; *Jenkins v. State,* 45 Tex. Cr. R. 173, 75 S. W. 312; *Davis v. State,* 126 Ala. 44, 28 South. 617. And why should such evidence be permitted unless tending to connect the accused with the commission of the offense?

If in cases where circumstantial evidence is relied upon for a conviction such footprints may be proven, with what reason may it be argued that the proof of such circumstances does not tend to connect the accused with the commission of the offense when corroborative of the testimony of an accomplice? In either event such evidence is competent only because it tends to connect the defendant with the commission of the offense.

Second, admissions against interest:

The witness Will Kelly testified as follows:

"Q. Did you have a conversation with Moody Friday evening about Rausin, Friday after New Year's? A. Friday evening as I went up to feed my hogs, after we heard about the killing; it was late, pretty close to night, and I went up to feed my hogs, and as I was going by he says, 'Will, that dollar and a half was the occasion of old man Rausin's being dead.' Q. You testified awhile ago that Rausin put up your and Mr. Moody's mules or horses? A. Yes, sir; that is right. Q. State if you know, how much Rausin charged Moody for his horses? A. A dollar and a half."

The foregoing statement of the accused indicates that immediately after the crime became known he was

acquainted with the motive underlying its commission, and, taken into connection with the other testimony in the record that the deceased and the accused had a difficulty over the impounding of the accused's mules a short time prior to the commission of the homicide, the remark made to Kelly and tending to corroborate the testimony of the accomplices was a circumstance tending to establish a motive for the commission of the offense, and while the proof of motive is not indispensable in order to prove guilt, yet, where crimes are committed secretly and a motive is shown, any testimony that tends to prove a motive on the part of the accused for committing the crime is competent as a circumstance tending to connect him with it.

Also the witness O. C. Burgess testified regarding a conversation between Harve Rausin and the accused after the first trial as follows:

"I unlocked the jail door and was standing with my hand on the door, and Mr. Harve Rausin came up and was talking to Mr. Moody, and he said, 'Moody, I don't want you to hold any grouch against me.' He says, 'It is all over now;' and he says, 'I stated that you were there at the haystack with a shotgun,' and he says, 'Is that so?' and Moody says, 'It is so, Harve.' (Defendant objects. Overruled. Exception.) He says, 'It is so, Harve; I wouldn't have harmed a hair on your head, Harve; it was Old Bill I was after.' "

This testimony, left as it was, unexplained and uncontradicted, tended to establish the fact that prior to the homicide the accused was carrying a shotgun near the premises of the deceased lying in wait for him, and indicated a desire on the part of the accused to do the deceased some great bodily harm.

In the conversation with Harve. Rausin in the pres-
ence of Burgess the accused admitted that at the time
he was lying in wait at the haystack with his shotgun,
on the foggy morning between Christmas and New
Year's, he was after "Old Bill."

Was that statement made? Rausin and Burgess
both testify that it was. As witnesses neither of them
was impeached or contradicted, and if it was true that
the accused "was after Old Bill" with a shotgun between
Christmas and New Year's, that fact corroborates Tom-
mie Moody's and Fitzhugh's testimony to the effect that
the accused directed them to shoot the deceased on New
Year's Day. While not directly connecting the accused
with the killing, it was a circumstance tending to prove
that just a few days prior to the homicide the accused
desired the deceased out of his way. It indicated a de-
sign on the part of the accused to kill deceased. This
admission of the accused that he was lying in wait at
that time with a deadly weapon for the deceased is a
circumstance properly admitted in evidence as tending
strongly to connect the accused with the commission of
the homicide which occurred within a short time there-
after. Admissions similar to this have been held to be
sufficient corroboration of an accomplice. *People v.
Cleveland*, 49 Cal. 577; *People v. Davis*, 135 Cal. 162, 67
Pac. 59; *State v. Hennessy*, 55 Iowa, 299, 7 N. W. 641.

The testimony of Harve Rausin that the accused was
lying in wait with the shotgun shortly before the homi-
cide and the admission afterwards made by the accused
that at that time he was "after Old Bill" (the deceased)
indicates an intent on the part of the accused to unlaw-
fully take the life of the deceased at that time.

A criminal intent being a material element of the crime charged, corroboration of an accomplice on such element by independent evidence has been held to be sufficient. *People v. Davis,* 21 Wend. (N. Y.) 309; *People v. Josselyn,* 39 Cal. 393.

"Proof of a motive and intent to commit a crime which there was evidence to show had been committed * * * would legitimately tend to strengthen a belief in the statement of the accomplice that they had committed it." (*Com. v. Chase,* 147 Mass. 597, 18 N. E. 565.)

Third, contradictory statements:

Accused made contradictory statements concerning the tracks leading away from the place where the body of the deceased was found to the premises of the accused. The accused told the witness Newby shortly after he was arrested that he was satisfied he could name the party who did the killing, and indicated Alfred (Sammie) Fitzhugh. Later on during the same day the accused in a conversation with the sheriff (Buzzi) made a different statement conflicting with the statement made to Newby.

The sheriff testified as follows:

"A. He said that if we would get a big negro boy by the name of Asberry that we would have the right man; that he had seen him come up by his place that evening while he was fixing some shafts; that he seemed to be excited and was in a hurry, and walking very fast. Q. Did he say what direction he came from? A. Yes; he said that he came from the north and went right on south from his place towards the road. Q. Anything said about the size of his shoes? A. He said he wore the same size shoe, or about the same size of his, and would make a track about like his."

After the first trial, and some time during the month of September, the accused had a conversation with the

witness Burgess with reference to these tracks in which
he said:

"A. Moody said that what I swore about the tracks
was true; that the tracks were there, and they were Bill
Kelly's tracks; that he saw Bill Kelly go from there
straight in that direction; and that he came back after-
wards from there. Q. Did he say anything further about
it? A. No, sir. Q. Now what did you testify? (Objec-
tion. Overruled. Exception.) A. Do you mean in the
former trial? Q. Yes, sir. A. I had testified that these
shoes fitted the tracks. Q. State whether or not your
testimony then was the same as now. (Objection. Over-
ruled. Exception.) A. I think it is."

Burgess also testified that Will Kelly was with him
when he measured the tracks leading from the body, and
that Kelly put his shoes into those tracks, and that the
tracks were too long for Kelly's shoes. Will Kelly tes-
tified that he was at home on the afternoon of New Year's
Day, and that he did not go in the direction of the place
where the body was found that afternoon or evening.
There was also evidence in the record that the negro
Asberry had left that community on a train about noon
of New Year's Day. The accused evidently realized the
importance of the necessity to explain away these tracks
which were found at and near the scene of this homi-
cide, and the fact that he made contradictory statements
concerning these tracks, which statements were after-
wards shown to be false, in our opinion was competent
evidence to go to the jury as tending to corroborate the
accomplices and tending to connect him with the offense.

Fourth, expressions of ill will and threats:

The record also shows certain expressions of ill will
and threats made by the accused toward the deceased a
short time before this homicide, such as "he would shoot

old man Rausin into bug dust, if it was the last thing he did," to the witness Berry, and again a similar expression to the witness Kelly on the morning that the homicide was committed.

In the case of *Roberts v. State*, 96 Ark. 58, 131 S. W. 60, it was held:

"On a trial charging accused with being an accessory before the fact to murder, the testimony of a witness that he shot decedent and was hired to do so by accused, who furnished the weapon, is sufficiently corroborated by proof of the ill will of accused towards decedent and of threats by accused to do decedent harm."

Other cases to similar effect: *People v. McLean*, 84 Cal. 480, 24 Pac. 32; *People v. Martin*, 19 Cal. App. 295, 125 Pac. 919; *Commonwealth v. Chase*, 147 Mass. 597, 18 N. E. 565.

We reach the conclusion, therefore, that the testimony of the accomplices in this case was sufficiently corroborated by independent evidence tending to connect the accused with the commission of the offense.

Nor do we believe that the court abused its discretion in refusing to permit the witness Sammie Fitzhugh to be recalled for further cross-examination. The record discloses that this witness was very thoroughly cross-examined on all phases of the case, and it is not shown that it was desired to cross-examine him on any matter not already touched upon; it appearing that counsel for accused merely desired to further cross-examine the witness relative to the conversation he had with his father and uncle when he first disclosed the accused's connection with the offense. This matter was thoroughly gone into on cross-examination already had, and had counsel desired to impeach the witness relative thereto

sufficient ground had been laid to show by other wit-
nesses that he had made false or other contradictory
statements concerning what he had said to his father
and uncle. Counsel for defendant not only cross-exam-
ined this witness, but had already recross-examined him.
Where there is no showing made to the court that certain
material matter could be elicited by further cross-ex-
amination, this court cannot say that the trial court
abused its discretion in refusing to permit further cross-
examination under such circumstances.

It is also contended that the county attorney commit-
ted reversible error in his closing argument to the jury
in that he referred to the defendant's failure to take the
witness stand in his own behalf. The argument of the
county attorney was not taken by the court stenographer.
During the course of the argument counsel for the de-
fendant made objection and took exception to certain re-
marks, and at the time this objection was made a con-
troversy arose between counsel for defendant, the county
attorney, and the court as to the exact remarks made.
On the next day, in order to settle the matter, the court
made a finding of the facts occurring, which finding is
embodied in the record, and is as follows:

"STATEMENT OF THE COURT.

"Be it remembered that on December 10, 1914, in
the trial of the cause of the State of Oklahoma v. Samuel
Moody, during the closing argument of the county attor-
ney, Streeter Speakman, the statement in said argument
to which the attorneys for the defendant excepted as
shown by the record was as follows: The said county
attorney in answer to an argument made by the counsel
for the defendant and addressed directly to the county
attorney, he being asked in said argument of defendant's
counsel why he had not brought the father of Sam Fitz-

hugh here to testify, that Sam had told him (Sam's father) that the defendant sent him to kill Rausin, and used the following language: 'Sam Fitzhugh has testified before you that he told his father this story, and that testimony is undenied.' And immediately following this, in reply to the argument of the defendant's counsel wherein said counsel said that defendant denied to witness Newby that he was guilty, the county attorney said and used the following language: 'Counsel for the defendant in their argument stated that the defendant had denied to Mr. Newby that he was guilty. I do not blame him for denying it. If I had placed upon the brow of my son the crimson brand of murder, I would deny it; I would deny it; I would deny it.' Signed and made a matter of record in the case in open court this the 11th day of December, 1914, the defendant being present in person and by counsel.

"FRANK MATHEWS, *Presiding District Judge.*"

Counsel for defendant had the right to 'demand that the argument of the county attorney be taken down in shorthand, and the refusal of the court to permit the same would have been reversible error. *Walker v. State,* 6 Okla. Cr. 370, 118 Pac. 1005; *Lamm v. State,* 4 Okla. Cr. 641, 111 Pac. 1002. Where the argument of the county attorney is not taken down in shorthand and embodied in the record in full, this court is bound by the finding of the trial court recited in the record as to what occurred. *Buck v. Territory,* 1 Okla. Cr. 517, 98 Pac. 1017; *State. v. Hasty,* 121 Iowa, 507, 96 N. W. 1115.

The record discloses that the argument of the county attorney was made in reply to certain argument of counsel for defendant and addressed directly to the county attorney. And it is contended that the argument of the county attorney replying thereto in answer to the inquiry, "why he had not brought the father of Sam Fitz-

hugh here to testify that Sam had told him (Sam's fa-
ther) that the defendant sent him to kill Rausin," where-
in the county attorney said, "Sam Fitzhugh has testified
before you that he told his father this story, and that
testimony is undenied," was an indirect reference to the
failure of the defendant to take the witness stand. We
have examined the testimony of Sam Fitzhugh with
reference to this conversation, and find that the only
parties present at the time were Sam's father and uncle;
the defendant at that time was in jail at Chandler. Clearly
the defendant could not have denied this testimony had
he taken the witness stand, and it would be an imputa-
tion of ignorance to the jury to hold that the answer
of the county attorney to this argument of counsel un-
der the circumstances of this case had reference to the
failure of the defendant to testify, or in any way misled
the jury.

Section 5881, Rev. Laws 1910, provides:

"Defendant a Competent Witness.—In the trial of
all indictments, informations, complaints and other pro-
ceedings against persons charged with the commission of
a crime, offense or misdemeanor before any court or
committing magistrate in this state, the person charged
shall at his own request, but not otherwise, be a com-
petent witness, and his failure to make such request shall
not create any presumption against him nor be men-
tioned on the trial; if commented upon by counsel, it
shall be ground for a new trial."

This court has held that the foregoing statute is man-
datory, and any comment either direct or indirect by
counsel on the failure of the defendant to testify is
ground for new trial. The damage done by such a re-
mark cannot be cured by its withdrawal from consider-
ation by the jury. The statute being mandatory, and in

view of the strict construction given to it in favor of the defendant, in order to constitute reversible error, the remarks made must either directly or indirectly constitute a comment such as is prohibited by the statute. And, if in this case the evidence showed that the defendant was present and could have denied the statements made by Sammie Fitzhugh in his disclosures to his father and uncle, we would unhesitatingly reverse this judgment.

Counsel for defendant have failed to cite a single authority which holds that a statement of the county attorney to the effect that certain testimony is undenied amounts to indirect reference to the defendant's failure to testify where the defendant was not present and could not under the circumstances have denied the fact had he taken the witness stand. The argument therefore, in our opinion, was not erroneous.

As to the statement of the county attorney: "Counsel for the defendant in their argument stated that the defendant had denied to Mr. Newby that he is guilty. I do not blame him for denying it. If I had placed upon the brow of my son a crimson brand of murder, I would deny it; I would deny it; I would deny it"—that seems also to have been elicited by argument of defendant's counsel wherein said counsel stated that defendant denied to the witness Newby that he was guilty.

The cross-examination of Mr. Newby discloses the following:

"Q. Well, did Moody say that the Fitzhugh boy was running around there that day with a gun? A. Yes; he said he was continually hunting around there, and that he was out there that day with a gun, but he didn't say for them to find the Fitzhugh boy. He said that he could name the party who did the killing, and

named this boy that lived east of the dead man. Q. And he told you that he had run him off his place? A. Who? Q. Moody had run him off his place? A. I am not sure about that. He said that Mr. Rausin, the dead man, didn't like to have any hunting on his place, and that the boy was continually running around there with a gun hunting. He said that if they would arrest the Fitzhugh boy he was satisfied he would be the party who did the killing. He wanted them to telephone out to Mr. Buzzi and Mr. Speakman, who were then out holding an inquest, as I understand it. Q. Wanted them to phone out and have the Fitzhugh boy arrested? A. Yes. Q. Mr. Moody said he didn't have anything to do with it, d'dn't he? A. Yes."

Counsel for defendant saw fit to make the statement that defendant had denied his guilt to Newby. In answer to this argument the county attorney in effect stated that there was nothing unusual in the fact that he had denied his guilt; that under the circumstances any man would deny his guilt. The record discloses that this argument was not a comment upon the failure of the defendant to testify, but was a comment upon certain evidence introduced in the case. It was made in reply to argument along similar lines by counsel for the defendant. If this argument is to be held reversible error, then all argument of a prosecuting attorney must resolve itself into a mere statement of facts. He would be stepping on dangerous ground at any time he undertook to answer the argument of opposing counsel. And, where opposing counsel invite reply as shown by the record in this case, and such reply may sting, this court cannot say that it is reversible error such as would authorize the granting of a new trial unless from the record itself it is made clearly to appear that the argument complained of constitutes an infringement of the

defendant's statutory right not to testify. And, where the argument, when considered and construed in reference to the evidence, shows clearly that the county attorney was confining his argument to the evidence introduced and making certain comments thereon, especially will this court not reverse the judgment on this ground when these comments legitimately followed from the argument of the defendant's counsel and in answer thereto.

Misconduct of the court in that the trial judge in the absence of counsel for defendant instructed the bailiff in charge of the jury to inform the jury to cease deliberating upon their verdict until the court had delivered further instructions is alleged to be prejudicial error. The record on this question is as follows:

"The court wishes to state in regard to the recalling of the jury and giving the instruction requested by the defendant that when this instruction was first presented to the court I was of the opinion that it should not be given, and gave a similar one, drawn by myself. Soon after the jury had retired to deliberate upon their verdict I came to the conclusion that I was in error and should have given the instruction, so within 30 minutes after the jury had retired I went to the door of the jury room and requested one of the bailiffs in charge of the jury to state to them that it was my order that they should not deliberate further on their verdict until the coming into court the next morning, when I would desire to instruct them further. This order was communicated to the jury by one of the bailiffs in my hearing, and I directed both the bailiffs to at once go into the jury room where the jury was and see that they did not discuss the case any further, and go with them to their room where they retired and to have them in court the next morning. I also went in search for counsel for the defendant and went to a hotel, and the proprietor informed me, at the place that— I couldn't find them, and upon the conven-

ing of court the next morning I had the jury brought into the courtroom and withdrew from them the special instruction that I had given them the preceding evening, and gave to the jury the instruction requested by the defendant the evening preceding, and the record contains every word said by me or any one else while I was withdrawing the instruction that I had given them and giving the instruction requested by the defendant's counsel. I wish to state further that the jury retired and deliberated for more than eight hours before they returned a verdict into court."

This assignment of error was not directly submitted to the trial court in the motion for a new trial.

Section 5906, Rev. Laws 1910, provides:

"After hearing the charge, the jury may either decide in court, or may retire for deliberation. If they do not agree without retiring, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court."

It appears from the record that all that was said by the bailiff to the jury was "by order of the court" and in the presence of the judge. Nothing occurred that in any way tended to prejudice the substantial rights of the defendant, and it was clearly discretionary with the trial judge to recall the jury from its deliberations to give additional instructions or to correct the instructions already given, the defendant being present. *McClary v. Stull*, 44 Neb. 175, 62 N. W. 501; *Davis v. State*, 122 Ga. 564, 50 S. E. 376; *Patterson v. State*, 122 Ga. 587, 50 S. E. 489; *State v. Tripp*, 113 Iowa, 698, 84 N. W.

546; *People v. Shuler,* 142 Mich. 161, 98 N. W. 986; *Hardesty v. State,* 95 Neb. 839, 146 N. W. 1007.

Where such additional instructions are given in the absence of defendant's counsel, the trial court should, on its own motion, allow an exception thereto unless the additional instruction or instructions were such as had theretofore been requested by defendant's counsel. It appears from the record in this case that the additional instruction here given was requested by counsel for defendant during the course of the trial, and that the giving of same is not alleged to be error.

In view of the fact that the appellant was convicted of the crime of murder, based to a large extent on the testimony of the accomplices, we have carefully examined this record for prejudicial errors, and were the court convinced that such errors existed, this judgment of conviction would be reversed.

After a careful and full consideration of the record, however, we are convinced that the appellant had a fair and impartial trial according to the forms of law, and that the errors complained of and presented in brief of counsel for the appellant were not such as would authorize this court to reverse the judgment.

For the reasons given in this opinion, the judgment of the district court of Pottawatomie county is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.