## JOE TEAGUE v. STATE.

No. A—9373.   June 24, 1938.
(81 P. 2d 331.)

370

Wall & Green, of Sallisaw, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Ed J. Armstrong, Co. Atty., of Sallisaw, for the State.

BAREFOOT, J.   The defendant was charged jointly with Fred Bert Smith and Bob Nichols with the crime of larceny of live stock in Sequoyah county, was granted a severance, tried, convicted and sentenced to serve a term of five years in the penitentiary, and has appealed.

The first assignment of error is that the verdict and judgment is contrary to law and the evidence and that the evidence is insufficient to sustain the judgment and sentence, it being contended that the mule which it was alleged the defendant stole was: (1) Never identified as being the mule of Wesley DuBuc.   (2) That the testimony of Fred Bert Smith, the accomplice, had been discredited and impeached and was not corroborated.

These contentions may be considered together and of necessity will require a review of the evidence.

The defendant was charged with the larceny of an iron grey mule, the property of Wesley DuBuc.   The owner testified that on or about the night of November 18, 1936, he missed from his pasture near Gans, Sequoyah county, Okla., "an iron grey mule, heavy built, big boned, thick heavy bushy tail, dark brown on his legs, lighter on his back, and a flea bitten face"; that this mule had a water seed.   He made an investigation and found that the mule had been taken to the Williams Sale Barn, which is located at Moffett, Sequoyah county, Okla., and near Ft. Smith, Ark., and sold

on the night of November 18, 1936, and shipped to Memphis, Tenn. He went to Memphis and found that the mule had died after being shipped there and had been skinned. He found the hide and identified it as being taken from the mule owned by him and which had been stolen from his premises.

Fred Bert Smith, who was indicted jointly with this defendant, and who, under the law of this state was an accomplice, and whose testimony would, therefore, have to be corroborated, testified as a witness for the state. He said he had known Wesley DuBuc all of his life; that he had worked for him, and had worked the mule which was stolen and ridden behind it; that he had known the defendant Joe Teague for a couple of years, and that he had known his co-defendant Bob Nichols for two or three years, and had at one time lived a neighbor to him; that several weeks prior to November 18, 1936, the three of them had a conversation with reference to stealing some mules, and that defendant Joe Teague, who bought and sold mules on the market at Williams barn at Moffett, had told them he could use some "hot" mules, and that he would sell them on the "halves"; that about two weeks prior to the stealing of the mule on November 18, 1936, he and Bob Nichols had made an attempt to steal the DuBuc mule, and the defendant Joe Teague had made arrangements for a truck to meet them on the highway by the side of the road, and get the mule; that he and Bob Nichols went out for the purpose of getting the mule, but did not get it on that night; that he went on home and Bob Nichols went up the road to meet the truck. This testimony was afterwards corroborated by Jeff Lambert, who owned and operated a truck; that he had a talk with the defendant Joe Teague and agreed to send a truck up the highway near Muldrow (this was where the stolen mule was afterwards loaded) at night for the purpose of getting two mules; that he did not know they were stolen. He sent two men who were working for him, J. W. McWater and Roy Goodwin. Both of these witnesses testifying

for the state stated that they went in the truck after the mules; that the defendant Joe Teague told them where to go, and that they would meet a man by the side of the road with the mules; that they met a man by the side of the road whom they identified as the codefendant Bob Nichols; that he got in the truck and rode with them, and that they went nearly to Sallisaw, but did not see anyone with any mules and returned about 11 o'clock. The witness Fred Bert Smith then testified that he saw the defendant on the evening of the 18th of November, 1936, and that defendant told him he could use "them mules now", and that he and the defendant, and his codefendant agreed to get the mule that night; that defendant made arrangements for the truck to meet them, and that he and Bob Nichols left the barn about 4 o'clock and went south, and that they went into the pasture and got the mule; that Bob Nichols got in the car and went back, and that he led the mule to the foot of Nolin Hill, and Bob came there with the truck about 10 o'clock at night; that they loaded the mule on the truck and took it to Moffett to the back of the Leon Williams Barn and unloaded it; that Bob Nichols led the mule into the truck after they had blindfolded it, and he and the boy who was driving the truck punched it into the truck.

George Freeman, the boy who drove the truck, corroborated the witness's evidence to this effect. He testified that the defendant Joe Teague came to where he was on the night of November 18, 1936, after the sale had closed, and about 10:30 or 11 o'clock, and asked him if he had his truck with him, and he said "a boy had a mule, two mules, he wanted me to go and get". He identified Bob Nichols as being the boy who said he had a couple of mules he wanted him to go and get, and that they got in the truck, and went close to a little town and turned over on a hill, "and there came a boy leading a mule up the road". That they loaded the mule on the truck, and brought it to the Williams barn at Moffett, just as the witness Fred Bert Smith had testified.

Smith testified to the unloading of the mule by himself, Bob Nichols, George Freeman, the truck driver, and a negro boy who worked at the barn named "Doe". That the mule was sold at the Leon Williams barn that night for $117; that the defendant Joe Teague and Bob Nichols came to the rear of the barn soon after the mule was unloaded; that the check was made out in his name; that the boy who drove the truck, George Freeman, wanted his pay, and he tried to cash the check, but could not do so; that George Freeman went and saw the defendant Joe Teague and he indorsed the check and Jack Gentry, the proprietor of the Brown Bungalow, cashed the check, giving him $13 in money and a $61 check and a $43 check; that he paid the truck driver, George Freeman, $3, gave the $61 check to Bob Nichols, and he cashed it at Bob Harper's; that he took the $43 check and cashed it at Jack Gentry's and gave the defendant Joe Teague $12.50 of it, and gave the balance to Bob Nichols, and he only got $21 out of the check; that he was afterwards arrested and put in jail and made a statement to the officers which was the same as he was now making on the witness stand; that he was scared at the time he made the statement.

Frank Carson, testifying as a witness for the state, said that he was in the livestock business and had known the defendant Joe Teague for 8 or 10 years; that he knew Fred Bert Smith and Bob Nichols; that he saw them on the night of November 18, 1936, at the Williams mule barn in Moffett about 11:30 or 12 o'clock at night; that the defendant Joe Teague came to where he was at the Brown Bungalow and told him that there was a fellow that had a mule "and let's go buy him"; that they went to the loading chute and there saw a mule, giving the same description as that given by the owner Wesley DuBuc; that the negro boy led the mule to the front of the barn where it was light, and Joe Teague said to him: "Give this fellow a check for $117," and that he gave it to Fred Bert Smith; that he did not buy the mule but only did the paying for it; that it was not usual for transactions at the barn to be carried on in this manner;

that the usual way was for the sale to go through the owners of the barn and they would pay the owner and take out the commission and the sale would appear upon the books. The defendant Joe Teague tried to sell the mule that night to some party who needed a few mules to make out a shipment but because of a blemish was unable to do so, and the mule was taken to the pens of the defendant. The next morning he met the defendant and Clyde Smith, a brother of Fred Bert Smith, and one of them informed him the mule had been sold to a Mr. Carroll of Memphis, Tenn. He testified that this was the first time he had been associated with the defendant in the purchase of mules and that he did not know it was a stolen mule.

L. E. Beeland testified that he was in partners with Leon Williams in the horse and mule business; that he knew Joe Teague, who was working at the barn, and the company furnished him money to work on. The defendant would purchase mules and horses and the company would pay for them, and the profits would be split between them. Books were kept and final settlement made at the end of the year. The defendant had the authority to draw drafts upon him and his partner for the purchase of horses and mules at any time.

Defendant called several witnesses to the stand who testified to facts with reference to the mule being brought to the Williams barn on the night of November 18, 1936. There was no substantial variation in their testimony and that of the state's witnesses heretofore reviewed. Several witnesses testified to impeach the witness Fred Bert Smith, saying that his reputation for truth and veracity was not good. Some of the witnesses called did not know his reputation, and others said "he was a little windy".

The defendant, testifying in his own behalf, stated: That he had been in the horse and mule business all his life; that he was working at the Leon Williams horse and mule barn in November, 1936, admits purchasing the mule on

the night of November 18, 1936, and describes it in a very similar manner as described by the owner, Wesley DuBuc; that he knew Fred Bert Smith at this time, but had only met him a short while prior to the 18th day of November, 1936; that one morning about 11 o'clock Fred Bert Smith came to him at Mr. Harper's cafe, and asked him if he would like to look at a pair of mules; that he was busy trying to sell a load of mules, and did not see him until about two weeks later; that Smith came to him about 4:30 on Wednesday afternoon and wanted him to go and look at a pair of mules; that he was busy and could not go, and asked Smith to bring the mules to the sale barn; that he directed him to George Freeman, who was standing nearby; that he told Freeman that Smith wanted a truck; that he told Smith when he got back if he did not see him to ask about him and they would come after him. He then testified to someone calling him at the Brown Bungalow and of purchasing the mule, just about as testified to by the other witnesses. He denied ever having had any conversation with the witness Fred Bert Smith with reference to handling "hot" or stolen mules, and denies any knowledge of the mule being stolen which he purchased on the night of November 18, 1936. In explanation of the manner of purchase of the mule he stated Mr. Beeland had told him not to write any checks when drinking and that he had been drinking on that night and for this reason he asked Mr. Carson to write the check for the mule. That he had dealt with Mr. Carson before, and had purchased mules which were sold in his name; that his reason for indorsing the check was so they could get the money to pay Mr. Freeman for the use of his truck, and he knew that the check of Frank Carson was good; that he did not receive any part of the proceeds of said check from Fred Bert Smith or any one else; that he sold the mule on the following morning to Mr. Carroll of Memphis, Tenn., for $130; that this deal was made upon the books and it showed the sale by Frank Carson, and the money was paid to the barn.

On cross-examination he testified he had been convicted of a felony, but had not served a term in the penitentiary; that his lawyer had told him the matter had been thrown out of court. He admitted instructing Jess Lambert and Roy Goodwin with reference to going in a truck to get some mules, but stated that the testimony as given by Roy Goodwin was not true. He testified that it was 4:30 in the afternoon when he told George Freeman to go with his truck and not at 10:30 at night.

The state put on several witnesses in rebuttal, but their testimony was of no material difference than as heretofore stated.

From the above statement it will easily be observed that the evidence was conflicting. The contention that the mule was never identified as being the mule of Wesley DuBuc is untenable. The witness Fred Bert Smith positively testified that the mule was the property of Wesley DuBuc; that he had worked for him, and had driven and ridden behind the mule; that it was taken from the pasture where it was kept at the time he knew him. The description of the mule given by Wesley DuBuc compared most favorably with the description given by all the other parties who saw the mule. The only material difference was the weight, and that only varied a little over a hundred pounds. Mr. DuBuc testified positively as to the identification of the hide taken from the mule which died in Memphis, and the defendant testified to selling the mule to Mr. Carroll of that city. Other testimony in the record abundantly sustains the identity of the mule, as being the one owned by Mr. DuBuc. The contention that the witness Fred Bert Smith being an accomplice was not corroborated can in no wise be sustained. Practically every witness testifying for the state and also for the defendant, and the defendant himself, corroborated many statements to which he testified. It is not essential that corroborating evidence shall cover every material point in accomplice's testimony or be alone sufficient to warrant a

conviction. If he is corroborated as to some material fact or facts the jury may infer from that, that he speaks the truth as to all. Langley v. State, 53 Okla. Cr. 401, 12 P.2d 254; Moore v. First National Bank of Iowa City, 30 Okla. 623, 121 P. 626. The fact that certain witnesses swore that the witness Fred Bert Smith's reputation for truth and veracity in their opinion was not good did not require that his whole evidence be cast aside. It was for the jury to decide after hearing the evidence whether or not they would believe what he said to be true or false. They had the opportunity to see and hear all the witnesses, and it was for them to judge where the truth lay. The cases cited do not bear out the contention made by defendant. They are: Smith v. State, 109 Ga. 479, 35 S. E. 59; Hill v. Montgomery, 184 Ill. 220, 56 N. E. 320; Troxdale v. State, 9 Humph., Tenn., 411; Adams v. Adams, 17 N. J. Eq. 324. A reading of these cases reveals that they are in perfect accord with the doctrine as above announced, and as stated in the Smith Case (page 60):

"It is, of course, always a matter for them to determine whether any witness is really impeached,—that is, completely broken down as to credibility and, until this point is reached, they may or may not believe him, as they see proper."

Powell v. State, 101 Ga. 919, 29 S. E. 309, 317, 65 Am. St. Rep. 277, as remarked by Mr. Justice Lewis in Huff v. State, 104 Ga. 521, 524, 30 S. E. 808, 809, "the jury have the right to believe the witness who is attacked, rather than the witness brought to impeach him. Hence it does not follow that, while testimony may be submitted for the purpose of impeaching a witness, his testimony is thereby necessarily destroyed."

The case of Adams v. Adams, cited by defendant, clearly illustrates this proposition. This was a hotly contested divorce suit. It was tried by the court without a jury. The very witnesses whom it was sought to impeach were the ones

whose testimony was relied upon by the court to sustain his ruling, yet these witnesses were the type whose character and reputation was bad. In passing, it may be said that the evidence of the witness Fred Bert Smith was corroborated by many witnesses testifying in this case, and in many particulars by the defendant himself. The jury had the right to believe such witness' testimony, and if they found it had been corroborated to so say by their verdict, which was done in this case. There are many parts of the evidence which not only corroborated the witness Fred Bert Smith, but which connect this defendant with the commission of this crime. The witness Jeff Lambert testified to conversations he had with defendant with reference to the hiring of a truck for the purpose of getting mules in the night time, which was about the same as testified to by the witness Fred Bert Smith. The witness Roy Goodwin testified that he had a conversation with the defendant and he told him exactly where to go and there he would meet a man by the side of the road with the mules. That he went and found the party as defendant told him; that they went nearly to Sallisaw and did not see the party and returned without them. This is exactly as testified to by Fred Bert Smith when he said he could not catch the mule that night. The witness George Freeman corroborated the witness when he testified to going with the truck to get the mule on the night of November 18, 1936, and when he was directed by the defendant where to go, and what to do. The appearance of the defendant at the sales barn, late at night, just as testified to by the witness, and the irregular manner of the purchase of the mule, and the sale not being placed upon the books. The fact that defendant made an attempt to sell the mule on the very same night it was purchased and did dispose of it early the next morning. His indorsement of the check. His admission of meeting the witnesses at the very times he testified, but attempting to change the conversation had between them. The fact that he did not give a draft on the Williams barn as he had authority and it was his

custom to do. The conflict between his testimony and that of the other witnesses. His statements to the officers at the time of his arrest in comparison with his evidence at the trial. All of these matters were for the consideration of the jury, and under the law it is not for this court to say they came to the wrong conclusion.

Defendant's contention that it was error for the court to permit the county attorney at the close of the case to amend the information by inserting the name "Wesley Du-Buc" instead of "Dave DuBuc" cannot be sustained. Section 2888, Okla. Stats. 1931 (Okla. St. Ann., tit. 22, sec. 406), provides:

"When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, is not material."

The following cases, in construing this section, have held that the name of the owner is not a material matter, and one of which a defendant may complain: Ponoksy v. State, 8 Okla. Cr. 116, 126 P. 451; Marshall Dickson v. State, 28 Okla. Cr. 378, 231 P. 315. It is also provided by section 2830, Okla. Stats. 1931 (Okla. St. Ann., tit. 22, sec. 304), as follows:

"An information may be amended in matter of substance or form at any time before the defendant pleads, without leave, and may be amended after plea on order of the court where the same can be done without material prejudice to the right of the defendant; no amendment shall cause any delay of the trial, unless for good cause shown by affidavit."

Under this statute, it has been held many times by this court, that the permitting of the amendment of an information is not error where the amendment can be made without material injury to the defendant, and nothing is shown by the record that there was any material injury to the defendant by the amendment allowed by the court. Anthony

v. State, 55 Okla. Cr. 260, 28 P.2d 1115; Chandler v. State, 3 Okla. Cr. 254, 105 P. 375, 107 P. 735; Arms v. State, 49 Okla. Cr. 34, 292 P. 76, and cases cited therein; Potter v. State, 47 Okla. Cr. 254, 288 P. 362; Warren v. State, 61 Okla. Cr. 333, 68 P.2d 434; 7 A.L.R. 1525, and cases cited from many states; also 68 A.L.R. 929; Peebles v. State, 55 Miss. 434.

We have examined the record and the authorities cited with reference to the contention that the court erred in permitting the introduction of incompetent, irrelevant and immaterial evidence, and from such examination cannot sustain this contention. If any of this testimony was incompetent the evidence of defendant was sufficient to correct the error.

We appreciate the manner in which this case has been briefed. The defendant presented a defense to the jury which if they had believed it would have been their duty to acquit him, but they saw fit to believe otherwise, and convict him. Finding no substantial error in the record, it becomes our duty to affirm the judgment of the district court of Sequoyah county, and it is so ordered.

DAVENPORT, P. J., and DOYLE, J., concur.