EFTON HATHCOAT v. STATE.

No. A-9753.   Nov. 27, 1940.
(107 P. 2d 825.)

6

Harry G. Davis, of Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, J. Defendant Efton Hathcoat, J. B. Jackson, and Clyde Rush, Jr., were jointly charged in the dis-

trict court of Mayes county with the crime of larceny of domestic fowls. The defendant Efton Hathcoat asked for a severance and was tried, convicted, and his punishment assessed at one year in the penitentiary; and he has appealed.

The assignments of error are all directed to the proposition that the evidence introduced by the state is not sufficient to corroborate the testimony of the accomplice, Clyde Rush, Jr., who testified against the defendant.

In considering this question, a brief review of the evidence is necessary. We shall first consider the testimony as given by the accomplice. Clyde Rush, Jr., testified that he was 19 years of age and had lived in Pryor all of his life; that he, J. B. Jackson, and the defendant Efton Hathcoat were good friends and had run around together since they were kids. That on Saturday, May 7, 1938, he and J. B. and Efton were at the bookstore in the post office at Pryor; that in the conversation at that time, one of the codefendants asked the witness if he wanted to make some money. They did not tell him right at the time how the money was to be made, but he was to furnish the car. He tried to borrow his father's car, and he wouldn't let him have it. He then got his aunt's car and met the other two boys across the street from the First National Bank. After they started out of Pryor going west, one of the boys said that they were going to get chickens. The car was a 1936 Model Ford V8, blue in color. They turned north about three miles out of Pryor and drove three and three-quarters miles north. It had been raining that day, and the roads were slick and muddy. After they had passed Cohan's place about half a mile, the road was so slick that the car slid into a ditch. While they were stuck, Mr. Qualls and his family came along in the Qualls' pick-up. Mr. Qualls and his son got out and helped them for about 30 minutes;

and finally they got out of the ditch. They drove up to the section line corner and turned around and started back south. Mr. Qualls' car was at the Cohan place, and they passed him. When they passed him, he started following them until they got to the paved road, where they turned west; and he turned east. They went about a mile west to a well the other side of the Osage schoolhouse, where they stopped and filled the car with water. One of the boys spoke up and said, "Let's go back to Qualls' and get the chickens." They then turned the car around and drove back down the highway east to the section line leading north to Mr. Qualls'. They drove to Qualls' place, went up to the drive on the north side of the road, and turned around; came back and parked in front of the house; then they got out. Efton went to the barn to see if there was anybody at the barn. Rush got out and put mud on the license plate, and then went to the house and knocked to see if anybody was at home. He went to the well, washed his hands, and then went back to the car. He waited at the car while J. B. and Efton took three sacks and went after the chickens. They came back with chickens in the sacks. J. B. said that he could drive the car better than the witness, who then got in the back. J. B. and Efton got in the front seat. They went to Claremore. When they got to Seminole street, Efton suggested that since they all three looked dressed up, the produce man would get suspicious, and that it would be better for one of them to get out and let the other two go on to the produce house and sell the chickens. They agreed, and Efton got out. J. B. and the witness went in and sold the chickens. When the witness started out the door, there was Mr. Wilson, the undersheriff. He asked him what he had in the car, and then took him and put him in jail.

About two weeks after the chickens were stolen, the witness went to Tulsa with the defendant, during which trip the defendant said, "Puddle, I am supposed to inherit some money; and if you will take the rap, I will give you $3,000 when you get out." Another time he threatened to whip the witness if he told on him. The witness stated that he was testifying to the truth; and that he never did steal any chickens before and was never arrested and had never been in trouble before in his life. He was not promised immunity by the county attorney, who said it was up to the judge and jury to give him a sentence; but the county attorney did say he would recommend a lighter sentence if he told the truth.

P. F. Qualls, his wife, and his son, Forest Qualls, all testified. Their testimony, in substance, was that they left home on May 7, 1938, about 2 o'clock; that about one-half mile from their house they found the three defendants stuck in the ditch; and that they got out and helped them get their car out. While they were helping the boys, Mr. Qualls asked them where they had been. One of the boys spoke up and said they had been to Cohan's Lake fishing. During the conversation they were asked if they had had any luck; and another one of the boys said that they had caught some fish, but they did not have much luck. That they were suspicious of the boys' actions, and thought they were chicken thieves because they had had some chickens stolen the Saturday before, so they stopped at the Cohan place to see if the boys had actually been fishing there. That they learned that the boys had not stopped at Cohan's Lake. That while they were at Cohan's, the blue car in which the boys were traveling passed them, going back south; and they started following it and followed it to the pavement. That the boys turned west towards Claremore; and they turned east and went on to Pryor. That

they went to the produce house at Pryor, called the sheriff's office, and told them about the boys. That Mr. Wilson, the undersheriff, called Claremore and told them to look out for this car. That Qualls and Mr. Wilson got in the car and went to Claremore. They caught the defendant Clyde Rush, Jr., at the produce house; that the chickens he had just sold belonged to the Qualls, and had been stolen from them.

Willard Rose testified that he was drilling Sudan grass in the field north of the Qualls house at the time the chickens were stolen. He was about a quarter of a mile north of the house; and there was nothing between him and the house to obstruct his view. He related that he saw a car with three men in it drive up to the Qualls' yard gate. It came from the west; it started off after staying there a little while. It then came back and stopped at the gate. One boy went to the house; and he saw another boy coming from the barn. He just saw three persons. He started towards the house and was about 220 yards away when they left. One of the boys stayed in the car while the other two came back, each with a sack in his hands. He was not close enough to identify either of the three boys.

Earl Lee testified that he lived about a mile from the Qualls farm. That he had heard the testimony of the other witnesses. That he saw the blue Ford, described by the witnesses, in which the three boys were traveling, four times that Saturday afternoon. This witness did not know any of the three boys riding in the automobile, but he saw the car pass his house going north, which fact according to the other testimony would have been just before it was stuck in the mud; he saw it a second time after it had been pushed from the ditch in which it was stuck and had turned around and started south; he saw it a

little while later pass his house and turn west towards the Qualls farm. The last time he saw the car, it was coming from the west, which is from the direction of the Qualls farm, and turn south at the corner and pass his house. The first three times the automobile passed his house, the three boys riding in it were all in the front seat; the last time it passed his house, two were in the front seat and one in the back seat.

For the defendant, the defense was in the nature of an alibi. The defendant took the witness stand and admitted to meeting with the two boys at the post office as related by Rush. He admitted leaving town with the other two boys in the blue Ford automobile, turning off of the paved highway, and driving three and three-fourths miles north on the muddy road, where they got stuck. He admitted that one of the boys told Qualls at the time they were helped from the ditch that they had been at Cohan's Lake fishing, which he knew at the time the statement was made was untrue. He admitted being in the automobile when it was turned around after being pushed from the ditch, and driving back to the main highway and to the well near the Osage schoolhouse. From that point on, there is, however, a decided conflict in the testimony of the defendant and the accomplice, Clyde Rush, Jr.

The defendant testified that Clyde Rush, Jr., proposed at the well that they go back to the Qualls house and get the chickens; and that he stated that he had been in enough trouble and that he was not going; and that he got out of the automobile and started walking home. That he lived about a mile south of the highway at that point. That he met a boy by the name of Ralph Panter and went back to Pryor with him in his car; that Ralph Panter was there in Pryor the day of the trial and had been subpoenaed as a witness in his behalf. (Panter did not testify.) That

he did not help steal the Qualls' chickens, and was not in the Rush car any more from the time that he got out at the well. That he went to Wagoner Saturday night and stayed Sunday and Sunday night and came back on Monday night. That he went to Maizie on Tuesday to stay until his dad could find out for sure that he had been charged with stealing chickens. That he returned from Maizie on Wednesday night and came with his dad to the sheriff's office on Thursday morning. That he had pleaded guilty to a charge of burglary about two years before, but had been given a suspended sentence.

The defendant introduced the evidence of four of his neighbors and his father. One of them, John R. Keel, testified that he was 70 years old. That about 3 o'clock on the afternoon the chickens were stolen, he was going to Pryor on the Claremore-Pryor road with a young lady by the name of Spoon; that he saw the defendant about 200 yards west of the schoolhouse. The defendant was walking east on the south side of the road. He saw the blue automobile and remembered that it had mud splashed on it; and there were only two boys in it. The other witnesses testified that they saw the defendant in Pryor after the drawing. One of them testified that he saw the defendant at the drawing, around 2 o'clock.

The witnesses offered by the defendant had him in Pryor at various times from 2 until 5 o'clock.

The defendant's own admissions, however, contradict part of this testimony, as he could not have been at the places where he admits being, and also in the town of Pryor at the same time. If the defendant had not been in such close proximity to the Qualls family at the time the car was stuck in the mud hole so that they could positively identify him, he could have denied all of the state-

ments made by the accomplice, Rush, and would have had alibi testimony to have kept him in Pryor during all of the time of the occurrences as related by the accomplice.

In rebuttal, the state introduced the testimony of the undersheriff, who testified that he was called early Saturday afternoon by Mr. Qualls, who told him about seeing the three boys on the muddy road west of Pryor and suspecting them of being chicken thieves; that at Qualls' suggestion he called the officers at Claremore to be on the lookout for this automobile. That he and Qualls then got in his automobile and immediately started to Claremore. That he did not know the exact time that they arrived at Claremore, but thought it must have been about 2:30 or 3 o'clock. That they caught the defendant Clyde Rush, Jr., right after he had sold some chickens at the produce house and arrested him at that time. That between the time of the theft of the chickens and the next Thursday morning when the defendant came to the sheriff's office and surrendered, he went to see the defendant's old man at his home; that the defendant was not there, but the old man told him he would bring defendant in the next morning.

In the early case of Moody v. State, 13 Okla. Cr. 327, 164 P. 676, this court laid down the rule with respect to the corroboration of accomplice testimony. In that case it was held:

"Evidence corroborative of an accomplice need not directly connect the defendant with the commission of the crime; it is sufficient if it tends to connect him with its commission.

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only.

"It is not essential that the corroborating evidence shall cover every material point testified to by the ac-

complice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof."

There have been many decisions by this court since the decision in the Moody Case, supra. In some of them the wording of the decision has been slightly different from the wording of the law set forth in the Moody Case, but the substance of these decisions is the same; and this court has consistently adhered to the law as set forth in the Moody Case.

With this test in mind, let us see what facts are proven which are corroborative of the testimony of the accomplice:

First. An admission by the defendant that he was a friend and associate of the accomplice.

Second. An admission by the defendant that he met his two codefendants at the post office and went riding with them. The fact that the defendant, a country boy, admits leaving the town of Pryor on a Saturday just at the time of the general drawing, where all of the farmers in the vicinity of Pryor attended, and driving off on a muddy road for three and three-fourths miles just for the ride, is a very suspicious circumstance and strongly corroborative of the accomplice testimony. This court feels that there is something stronger than just the urge to go for the ride that impelled these boys to take this drive.

Third. The testimony of Earl Lee, who saw the car in which the thieves were traveling four times. There were three boys in the car each time he saw it. The last

time he saw the car, which was after the theft, two boys were in the front and one in the back seat.

Fourth. The testimony of Willard Rose, which proves that the theft was committed by three persons.

Fifth. The action of the defendant in fleeing from one relative to another during the several days after the crime was committed.

Sixth. The short space of time from the time Qualls last saw the boys in the blue car until Qualls and the undersheriff arrested the accomplice at Claremore. According to Qualls' testimony, he called the undersheriff immediately upon his arrival at Pryor, and shortly thereafter they started for Claremore to search for the suspicious looking automobile. Since it is definitely established by the proof of Willard Rose that three men committed the theft, it is very unlikely that the defendants Rush and Jackson would have picked up a third party in so short a time to have taken with them to the Qualls farm after the chickens, which would have had to be the fact if the story related by the defendant Hathcoat was true.

Seventh. The defendant Hathcoat lived a mile south of the Osage schoolhouse, which would have made him the only one of the three boys who was thoroughly familiar with the vicinity where the boys were traveling that afternoon in the automobile. The accomplice lived in Pryor.

While none of these facts and circumstances standing alone would be deemed sufficient corroboration of the accomplice's testimony, still, when they are all considered together, they are sufficient under the law pronounced by this court many times.

The law prescribes no standard for the strength of the corroborating evidence, and there is a failure to cor-

roborate only if there be no evidence legitimately having that effect. Underwood v. State, 36 Okla. Cr. 21, 251 P. 507.

In Haas v. State, 37 Okla. Cr. 335, 257 P. 1115, this court said:

"Where there is evidence in corroboration of an accomplice, tending to connect a defendant with the commission of the crime charged, the sufficiency of such corroborating evidence is for the jury."

In Key v. State, 38 Okla. Cr. 169, 259 P. 659, this court held:

"Where the sufficiency of the evidence to corroborate an accomplice is challenged, this court will take the strongest view of the corroborating testimony that such testimony will warrant, and, if it can say that there is corroborating evidence tending to connect the defendant with the commission of the offense, it will uphold the verdict."

The above cases are not cited because of the similarity of the facts in those cases to the case at bar, but solely for the rules of law adopted in each said case which are applicable to the instant case. This court has sustained many larceny cases where the evidence was no stronger than that shown herein. It is true that in a few cases we have granted reversals, but all of them can be distinguished from the facts in the case at bar.

The attorney for the defendant emphasized the fact that the defendant was not present at the produce house at the time the chickens were sold. In considering the sufficiency of the evidence to sustain the conviction, this court under its decisions must give credence to the testimony of the two state's witnesses who proved that three persons accomplished the theft. Whether it was the defendant or some person whom the accomplices Rush and Jackson picked up after they had been with the defendant

at the well, as has been suggested by counsel for the defendant, the third party was not present at the time the chickens were sold. Whoever he might have been, he did not choose to be seen at the produce house. The explanation as to why the defendant did not wish to be seen is very plausible in view of the fact that the defendant is the only one of the three parties charged who had a criminal record. The defendant at that time being at liberty under a suspended sentence for burglary and being older and wiser than the older boys, it was natural that he would prefer to remain in the background as much as possible.

The court instructed the jury upon the question of accomplice testimony and submitted the question to the jury for their determination as to whether or not the facts were sufficient to corroborate the testimony of the accomplice. The jury was acquainted with all of the parties in the case and was able to see their demeanor on the witness stand. The facts were properly a question for the jury to determine; and in a case of this character, we shall not interfere with the verdict of the jury.

The judgment is accordingly affirmed.

DOYLE, P. J., concurring.

BAREFOOT J. (dissenting). It is not often that the members of this court are not in entire agreement in their opinion as to the result of cases brought here on appeal. However, I do not find myself in agreement with the conclusions reached by my colleagues in the above case. This is a small case and one that would not under ordinary circumstances demand the writing of a dissenting opinion, but when I am reminded by the record that the defendant is a young boy only 19 years of age at the time of his trial, and that this decision sends him to a felon's cell and takes from him not only his liberty, but, in all probability, his

usefulness as a citizen of this state, I cannot but express my view of the record as it appears to me.

The principles of law announced in the opinion and in the syllabus are correct, and I have no fault to find with those principles. It is the application of the facts to those principles of law with which I am not in accord.

Defendant was a boy 19 years of age. On Saturday, the 7th day of May, 1938, he was in the city of Pryor, and some time just after noon Clyde Rush, Jr., who was a co-defendant, asked defendant and J. B. Jackson, who was also a codefendant, to take a ride out in the country in Rush's father's car. They agreed to go for the ride. They drove about three and three-quarters miles west of Pryor on Highway No. 20, which is the highway running from Pryor to Claremore, then north three and three-quarter miles, at which point their car got stuck in the mud. This was about 2:15 p. m. While the car was stuck in the mud, P. F. Qualls, Rosa Qualls, his wife, Forrest Qualls, his son, and his son's wife came along the road going to Pryor, saw the car stuck in the mud, and assisted the boys in getting out. The boys followed the Qualls car for about a quarter of a mile to Highway 20, where the boys turned toward the west and the Qualls car proceeded east toward Pryor. There was no conflict in the evidence up to this point. The car in which the boys were riding went west about a mile and three-quarters by the Osage schoolhouse, stopping at a well by the side of the road to secure water for the car. The defendant testified that he left the car at this point and walked toward his home, which was about one and one-half miles west of the cross-roads where the two cars separated; when he reached Highway No. 20 and started south, that he was picked up by Ralph Panter in a car and went to Pryor and attended a public drawing contest that was held there on that day. The accomplice,

Clyde Rush, Jr., testified that the defendant did not leave the car, and that either the defendant or Jackson or himself said, "Let's go back and get the chickens." That the three of them drove to the home of Mr. and Mrs. Qualls, they being the same parties who had assisted them in getting out of the mud hole; and that they stole 16 chickens from the Qualls home, and drove to the edge of Claremore, in Rogers county, which the record shows is about 18 miles from Pryor, Okla. The witness Clyde Rush, Jr., testified that he got out of the car at the Qualls home and put mud all over the license plate. As a reason for this he stated that he had read magazines where this had been done. He further testified that when they crossed the railroad track at the edge of Claremore, defendant Efton Hathcoat said, "One of us had better get out. I'll get out and let you two go on"; and that defendant got out and was going to wait until they got back; that he and Jackson went to the produce company; that he took one of the sacks of chickens; that Jackson took another, and that they left one sack in the car; that just after they had sold the chickens and put them in a coop they were confronted by Undersheriff Wilson and Mr. Qualls, and Clyde Rush, Jr., was arrested and put in jail. J. B. Jackson escaped, and the charge in this case was the outgrowth of this arrest. The accomplice, Clyde Rush, Jr., testified that he had seen defendant one time after that, and that was on the road to Tulsa about a week after he got out of jail, and that the defendant told him if he would take the "rap" he would give him $3,000; that Buster Young was with them and heard the conversation; this witness was not at the trial and did not testify; that he saw defendant one time after that and he told him he was going to skin his head.

Mr. and Mrs. P. F. Qualls both testified to the loss of the chickens, the assisting of the boys out of the mud hole, and identified the chickens recovered in Claremore as their chickens, and that they did not give their consent to the taking of them.

Witnesses upon which the state relied to corroborate the evidence of accomplice, Clyde Rush, Jr., were Willard Rose and Earl Lee. Willard Rose testified that on May 7, 1938, about 3 o'clock, he was about a quarter of a mile north of the Qualls farm and that he had a clear view of the Qualls house; that he saw a car drive up to the yard gate from the west; that the car stopped there for quite a while and then left and came back and stopped at the yard gate; he saw one of the parties go to the house; one came from the barn and one stayed in the car. He did not see them going to the chicken house, but saw them coming from there; that each one of the three had a sack in his hand. He could not identify any of the parties and could not swear the defendant was one of them.

Earl Lee testified that he lived five miles northwest of Pryor and a mile and a quarter southeast of the Qualls home. On the 7th day of May, 1938, he saw a blue Ford V-8 car with three boys in it going north of Pryor, all three riding in the front seat; that he later saw it going south and saw it going north and then west at his house; saw it at the same place later coming from the west and turned out with three persons in the car. He testified on cross-examination that he did not know the defendant Efton Hathcoat, and could not identify him as one of the persons he saw in the car.

The above is the only material evidence offered by the state.

The defendant denied having participated in the larceny of the chickens, and, as above stated, testified that

he left the boys and walked toward his home and afterwards went to Pryor to the public drawing; that before he left them at the well, Clyde Rush, Jr., said: "The Qualls are going to town and let's go back and get his chickens;" that he told Rush he was not in the chicken business, and had enough trouble and asked Rush to take him home; that he said it was too muddy to take him home; that he walked back east about 100 yards and turned south toward his home, which was about a mile from there; that he did not get home, but went back to Pryor with a man by the name of Ralph Panter. Defendant testified that he had subpoenaed the witness Ralph Panter, but had not seen him; that when he left Pryor on Saturday evening, May 7, 1938, he did not hear about the chickens being stolen until Monday night; that his father told him that he had heard that he had been charged with the stealing of them; that he went to Mazie in Mayes county to the home of an uncle until his dad could find out for sure if he had been charged with the stealing of the chickens; that he returned to his home on Wednesday night, and on Thursday morning, about 9 o'clock, he went to the sheriff's office and gave himself up and made bond for his appearance before the district court.

The defendant offered as a witness in his behalf John R. Keel, a disinterested witness, who testified he was 70 years of age, and on May 7, 1938, he lived a mile north of the old Osage schoolhouse, which was very close to the well where defendant claimed to have left the car to go home; that on that afternoon, about 3 o'clock, he was traveling with a young lady by the name of Miss Spoon; that he does not know where she is at this time, but that her folks moved to Oxford, Kan.; that he knew the defendant Efton Hathcoat, and that he saw him on the south side of the road about half way between the well and the

schoolhouse walking east; that he was alone; that he saw a car at the well; that it was on the wrong side of the road and he had to wait for it to get out of the way; that the car headed west and had two parties in it whom he did not know; that defendant was not in the car; that Mr. Hathcoat and Efton were his neighbors and that they all worshipped at the Osage schoolhouse, and that Efton was a neighbor of Miss Spoon. The evidence was in complete accord with the evidence of defendant. It was in direct conflict with the evidence of the witness Clyde Rush, Jr.

C. C. Boren testified that he was well acquainted with the defendant Efton Hathcoat and his father; that he lived in the same neighborhood with them; that he attended a drawing at Pryor Saturday afternoon, May 7, 1938; that he positively identified the date, because he heard that evening that Mr. Qualls had some chickens stolen. He testified that he saw the defendant on the streets of Pryor about 3 o'clock Saturday evening on the corner near the American National Bank; saw him on two different occasions a few minutes apart; that he saw him with his father; that he was not related to defendant and had no interest in the case.

Guy Pitts, who lived in the same neighborhood and knew the defendant and his family for 15 years, testified that he was in Pryor on the day of the drawing, and after it was over about 3:30 he went down town and saw defendant on the streets of Pryor.

Edgar Whitmire, who lived five miles south of Pryor, testified he saw defendant there about 3:30 on Saturday, May 7, 1938.

P. H. Hathcoat testified that he was the father of the defendant; that he was in Pryor on the afternoon of Saturday, May 7, 1940; and he saw his son, the defendant, on

the streets of Pryor a little after 3 o'clock, and while witness was talking with Mr. Whitmire and Mr. Boren.

I am familiar with the rule that we have so often pronounced, that the verdict of a jury will not be set aside where there is any evidence in the record to sustain it; also the rule that where there is no evidence to sustain it, we will not hesitate to set the verdict aside. I also recognize the rule that where a conviction is to be considered upon the evidence of an accomplice, the court will carefully examine the evidence to see that the same is properly corroborated as required by the law of this state. And more especially should this be true where a defendant takes the witness stand and denies the statement of the accomplice, and not only denies it, but produces evidence of disinterested witnesses to corroborate his evidence and to refute the evidence given by the accomplice.

After a careful reading of all the evidence of this record, and especially the evidence of the accomplice, Clyde Rush, Jr., one is impressed with the necessity of his testimony being corroborated. At the very outset he testifies that the other defendants were the ones who suggested to him the stealing of the chickens, and that he secure his father's car for that purpose. He testifies that they were going out to "Qualls' Place," yet he afterwards testified he did not know where Qualls lived. He could not tell which of the three, at the well, suggested that they go to the Qualls home for the purpose of stealing the chickens. He further testified that he sat in the car when the chickens were being stolen and that the other two defendants brought the three sacks to the car. This is in direct conflict with the evidence of the state witness Willard Rose, who testified that each of the three had a sack of chickens. He also testified that at his own suggestion he procured mud and placed the same upon the license plate of the

car, and this was an original thought with him. It is passing strange that the defendant who was the instigator of the crime, according to his testimony, should be the one who left the car at Claremore and left it to the other two to go to the produce house and sell the chickens. This evidence does not just ring true. The defendant was never seen in Claremore; he was not present at the produce house when the chickens were delivered, and he produces five disinterested witnesses who corroborate the evidence which he gave, and the same is uncontradicted.

The statement of the accomplice, Clyde Rush, Jr., that defendant offered him $3,000 to take the "rap" is almost unbelievable. The evidence of the witness John R. Keel, a disinterested witness, completely corroborates the evidence of defendant. Evidence of the four witnesses who saw the defendant on the streets of Pryor between 3 and 3:30 o'clock on Saturday, May 7, 1938, and at the very time that the chickens were being stolen and taken to Claremore, according to the evidence of Clyde Rush, Jr., the accomplice, absolutely refutes this testimony.

I am at a loss to see how a jury could have carefully weighed all the evidence produced in this case and, under the instruction of the court requiring them to be convinced beyond a reasonable doubt of defendant's guilt, brought in a verdict of guilty against this defendant. I am not suggesting that defendant was not guilty of this crime. I am only speaking of the evidence as it appears in the record.

The corroboration relied upon by the state, as stated above, are the witnesses Willard Rose and Earl Lee. Their evidence has heretofore been stated. Neither of them was able to identify the defendant as being the party they saw. Each of them said they saw three persons. One at the time the chickens were being stolen, and at a distance of a

quarter of a mile, the other immediately after the chickens were stolen and in close proximity to where they were stolen. This is a circumstance that corroborates the testimony of the accomplice, Clyde Rush, Jr., but under the law and the evidence taken as a whole, is this sufficient corroboration to uphold this judgment and sentence against this defendant? I do not think so.

It is provided by section 3071, Okla. Stats. 1931, 22 Okla. St. Ann. § 742, as follows:

"A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

This statute has been constructed so often by this court that it will not be necessary to cite all of the cases. The case of Kennedy v. State, 65 Okla. Cr. 77, 83 P. 2d 198, 200, in quoting from the case of Rogers v. State, 57 Okla. Cr. 294, 48 P. 2d 344, one of the leading cases, announced these general rules with reference to what was necessary for the corroboration of an accomplice's testimony:

" 'There must be some evidence, which of itself, and without aid from the accomplice's testimony, tends to connect the defendant with the offense committed.

" 'It is not sufficient corroboration to prove that the crime was committed in the manner described by the accomplice, but his testimony must be corroborated as to the particular defendant.

" 'It is not sufficient for this purpose merely to connect the defendant with the accomplice, or other person participating in the crime, but evidence, independent of the testimony of the accomplice, must tend to connect him with the crime itself, and not simply with its perpetrators.

" 'The corroborating evidence may be sufficient although by itself slight, but it is not sufficient if it merely tends to raise a suspicion of guilt. 1 Enc. of Ev., pp. 104, 105, 106, and 108, and cases cited.' Peck v. State, 50 Okla. Cr. 213, 297 P. 323; Stevenson v. State, 50 Okla. Cr. 295, 297 P. 328; Hicks v. State, 18 Okla. Cr. 718, 196 P. 144; State v. Roy Wilks, 17 Okla. Cr. 247, 187 P. 813; Weaver v. State, 58 Okla. Cr. 360, 53 P. 2d 696."

The Kennedy Case is one very similar to the case at bar, and in our opinion the facts in that case were stronger than in the instant case, and it was reversed because the evidence was insufficient to corroborate the accomplice.

In the instant case, when the testimony of the accomplice is eliminated, you have only the testimony that the defendant was seen in company with the accomplice prior to the time the chickens were stolen, and the testimony of a witness that at a quarter of a mile distance he saw three parties at the Qualls home. He did not know who they were, and at no time identified the defendant as one of these parties. Another witness testified he saw three parties in a Ford car driving by his home, which was near the Qualls home, about the time the accomplice said the chickens were stolen. There was no identification of the defendant by this witness. He did not know any of the parties. This evidence at the very best could only create a suspicion against the defendant. Some of the cases that have discussed this question are here cited. Madden v. State, 26 Okla. Cr. 251, 223 P. 716; Hamilton v. State, 53 Okla. Cr. 281, 10 P. 2d 734; Rogers v. State, 57 Okla. Cr. 294, 48 P. 2d 344. In the case of Hankins v. State, 62 Okla. Cr. 252, 71 P. 2d 119, 121, the court says:

"It is not sufficient corroboration to prove the crime was committed in the manner described by the accomplices. Their testimony must be corroborated as to the particular defendant, and it is not sufficient for this purpose merely

to connect the defendant with the accomplices, or other persons participating in the crime, but the evidence must tend to connect him with the crime itself, and not simply with its perpetrators, and corroborating evidence may be sufficient although of itself slight, but it is not sufficient if it merely tends to raise a suspicion of guilt."

In the following cases: Saied v. State, 65 Okla. Cr. 124, 83 P. 2d 605; Scott v. State, 65 Okla. Cr. 47, 82 P. 2d 684; Teague v. State, 64 Okla. Cr. 369, 81 P. 2d 331; Rice v. State, 60 Okla. Cr. 398, 64 P. 2d 1240; Brewer v. State, 63 Okla. Cr. 389, 75 P. 2d 901; and Wilson v. State, 66 Okla. Cr. 322, 92 P. 2d 625, this court has held that the evidence was sufficient to corroborate the accomplice. It will be noted that in most of those cases the defendant had been identified positively by the witnesses who corroborated the accomplice. In the instant case there is no such testimony. The evidence in those cases was much stronger than in this case. The testimony fails to exclude every other reasonable hypothesis than that of the guilt of the defendant. The corroborating circumstances amount to nothing more than a suspicion of the defendant's guilt. As stated in the case of Rogers v. State, supra [57 Okla. Cr. 294, 48 P. 2d 347]:

"The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty."

The statement in the original opinion that one of the witnesses who testified for defendant said "that he saw the defendant at the drawing, around 2 o'clock," is hardly correct. This was the witness Guy Pitts. He at first testified that he saw the defendant down where the draw-

ing was; that it usually started about 2 or 2:15 o'clock and was possibly over in 45 minutes. He was then asked:

"Q. Did you see him at the drawing? A. No, sir. Q. I didn't think you said that. Now, when did you see him with reference to the closing of the drawing? A. Well, I judge somewhere along 3:30. Q. In Pryor? A. Yes, sir. Q. You know that it was Efton Hathcoat? A. Yes, sir. Q. When did you go home? A. It was about four or 4:30. Q. Did you see him more than once, or just the one time? A. Three or four times. He was standing just a little further down the street."

There can be no question of the testimony of the witnesses produced by the defendant. They placed the defendant in the city of Pryor, 18 miles distance from Claremore, at the very time it would have been necessary for him to be in Claremore, according to the evidence of the accomplice Clyde Rush, Jr. There was a slight variance as to the time they saw him, but it was not such a variance as would have permitted him to have been with the accomplice at the time he stole the chickens and took them to Claremore and sold them, and was arrested with a part of them in his possession.

The majority opinion further states:

"The defendant's own admissions, however, contradict part of this testimony, as he could not have been at the places where he admits being and also in the town of Pryor at the same time."

This is not as I read the record. The defendant testifies that he was picked up by Ralph Panter, whom he names, and then he was asked:

"Q. When you got to Pryor about what time was it? A. Well, it was about 3 o'clock."

The evidence showed it was only four miles from the Osage schoolhouse to Pryor, and would have only taken him a few minutes to get there.

A disinterested witness, John R. Keel, an old man past 70 years of age, testified that he saw the defendant walking in the road, just as defendant testified, and "it wasn't very far from 3 o'clock."

Witness C. C. Boren testified he saw the defendant in Pryor, and he judged "it was around three o'clock in the afternoon," and it was after the drawing.

Guy Pitts testified as above stated.

Edgar Whitmire testified to seeing the defendant at Pryor around 3 or 3:30 o'clock.

P. H. Hathcoat, who is the father of the defendant, testified that he saw the defendant in Pryor, and in his judgment it was around 3 o'clock; that it was after the drawing.

Deputy-Sheriff Wilson for the state testified that it was 3 o'clock when he was at Claremore and arrested the accomplice, Clyde Rush, Jr., at the produce house with the stolen chickens in his possession. If Deputy-Sheriff Wilson's testimony is true, then it was a physical impossibility for the defendant to be at Pryor, 18 miles away, at the very time the accomplice was at Claremore with the stolen chickens.

There can be but one conclusion drawn in this case, and that is, if the testimony of the defendant and the independent witnesses John R. Keel, C. C. Boren, Guy Pitts, Edgar Whitmire, and defendant's father, P. H. Hathcoat, was true, then the testimony of the accomplice, Clyde Rush, Jr., was untrue. Can it then be said that the corroboration of the accomplice in this case was sufficient? I cannot come to that conclusion.

It is further stated in the majority opinion:

"If the defendant had not been in such close proximity to the Qualls family at the time the car was stuck in the

mud hole so that they could positively identify him, he could have denied all of the statements made by the accomplice, Rush, and would have had alibi testimony to have kept him in Pryor during all of the time of the occurrences as related by the accomplice."

I find nothing in the record to justify this statement. It seems that, instead of giving this 19-year-old school boy the benefit of the presumption of innocence with which the law shields him, every inference and doubt is resolved against him. If I were indulging in presumptions in this case, it would be that the witness Willard Rose, who was permitted to sit in the courtroom during the trial of this case, did not see three parties at the Qualls house at the time the chickens were stolen, and that the witness Earl Lee probably saw the three boys in the car when they were together passing his house, and just presumed, after hearing the case tried, that there were three of them when they passed the last time.

The cases cited in the majority opinion to sustain the judgment and sentence are: Moody v. State, 13 Okla. Cr. 327, 164 P. 676; Underwood v. State, 36 Okla. Cr. 21, 251 P. 507; Haas v. State, 37 Okla. Cr. 335, 257 P. 1115; Key v. State, 38 Okla. Cr. 169, 259 P. 659.

In the Moody Case the law is correctly stated with reference to the corroboration of accomplices, but an examination of the facts reveals a very different line of corroboration than in the case at bar. It is unnecessary to prolong this opinion by stating the facts. The defendant was charged with murder, and given a life sentence. The facts were much stronger than in the case at bar, and much of the corroboration was declarations made by the defendant himself.

In the Underwood Case the court found the witness was not an accomplice, and therefore it was not necessary that he be corroborated.

In the Haas Case the facts were somewhat similar to the facts here, but in that case the defendant was positively identified by two witnesses. Here no one positively identified the defendant.

In the Key Case it was reversed because the evidence was insufficient to corroborate the accomplice. The principles of law announced in the syllabus are correct, as are the principles announced in the majority opinion, but the court, speaking through Judge Edwards, found that the facts were insufficient to corroborate the accomplice. The court said that there is slight corroboration, but not sufficient to uphold the judgment and sentence. That is exactly what I find in this case.

In the case of Hamilton v. State, 53 Okla. Cr. 281, 10 P. 2d 734, 735, the court, after reviewing the evidence, says:

"This testimony creates a strong suspicion, because it shows opportunity for defendant to have aided or abetted or to have profited from the proceeds of the crime. The circumstances proven are too remote. The testimony is insufficient corroboration under the requirement of the statute and many decisions of this court. Kirk v. State, 10 Okla. Cr. 281, 135 P. 1156; Wever v. State, 22 Okla. Cr. 414, 211 P. 1062; Livingston v. State, 29 Okla. Cr. 247, 233 P. 235; Underhill, Crim. Ev. (3d Ed.) p. 161, § 130."

As stated in the case of Kirk v. State, 10 Okla. Cr. 281, 135 P. 1156, 1157:

"He could have named any other man in Washita county as an associate in this crime, and yet be corroborated as to this circumstance."

This is exactly the facts in the case at bar. The accomplice here could have named any man in Mayes county, saying that he picked him up before the chickens were stolen, and if he had an absolute defense and alibi that he

was not in Mayes county, yet the jury could have convicted him and, under the majority decision, the fact that three parties were seen at the time the chickens were stolen would be sufficient corroboration to find him guilty, regardless of his innocence, and this court would be powerless to give him relief. This argument, to my mind, is unanswerable as applied to the facts in the case at bar.

The trial court, at the time of passing upon the demurrer to the evidence in this case, said: "It is pretty close, but I will overrule the demurrer." At another stage of the trial, the court below said: "The law doesn't put much faith in an accomplice's testimony."

No doubt a new trial would have probably been granted, but trial courts are sometimes slow to grant new trials which necessitate a retrial of the case at the expense of the county, and especially when the case can be appealed to a higher court which can give relief.

I am of the opinion this case should be reversed and that the county attorney should interview the witnesses Ralph Panter and Miss Edna Spoon. If their evidence corroborates the evidence of the defendant and the witness John R. Keel, the case should be dismissed. If not, it should be retried. Also the witness Buster Young should be contacted as to whether he would corroborate the testimony of the accomplice, Clyde Rush, Jr., as to defendant's offer of $3,000 if he would take the "rap." The evidence of these three disinterested witnesses would either make or break this case. In my opinion justice to this young defendant demands this, and therefore I dissent to the opinion of the majority of the court rendered in this case.